WILLIAM J. LAURENCE *et al.* impleaded, etc.

*v.*

MARIA EVANS LAURENCE.

*Filed at Ottawa November 23, 1896.*

1. MARRIAGE—*contract of marriage is a contract jure gentium.* The contract of marriage is a contract *jure gentium,* and the consent of capable parties, with the assumption of the marriage status, is all that is required to its validity by natural or public law.

2. SAME—*restrictions imposed upon right to contract marriage—burden of proof.* Where the evidence establishes a contract of marriage *per verba de presenti,* one contending that such contract falls within restrictions imposed by the State where the marriage took place has the burden of proof upon that point.

3. SAME—*presumption of marriage from cohabitation is not conclusive.* Marriage will sometimes be presumed from cohabitation; but such presumption may be overcome, as cohabitation may be meretricious as well as matrimonial.

4. WITNESSES—*competency—section 2 of Evidence act construed.* The provision of the statute (Rev. Stat. 1874, p. 488, sec. 21,) which disqualifies as a witness in his own behalf a party to a suit where his adversaries sue or defend as heirs of a deceased person, is intended to protect the estate from the assaults of strangers, and relates to proceedings wherein the testimony of such party would tend to impair the estate. (*Pigg* v. *Carroll,* 89 Ill. 205, explained.)

5. SAME—*one conceded to be an heir is not disqualified.* Where a controversy arises among parties who are conceded to be the heirs of

164 367
73a 83

164 267
180 582

164 367
a188 [1]379
a188 [9]379

164 367
95a 375

164 367
96a [1] 66
f96a [3] 67
96a [7] 68

164 367
196 [2]444
101a [7]387

164 367
e201 [5]113
e201 [6]113

164 367
210 [5]168
210 169

164 367
212 [2]245

a deceased person, such heirs may testify·in their own behalf, as such testimony does not tend to impair the estate.

6. SAME—*when one claiming to be an heir is disqualified.*   One who, as the widow of a deceased person, is prosecuting a suit against which her adversaries are defending as his heirs, is not competent to testify in her own behalf until the fact of her marriage is proved or conceded, nor, in such case, is she competent to prove the marriage itself.   (*Brown* v. *Brown*, 142 Ill. 409, overruled in part.)

7. EVIDENCE—*circumstances which tend to establish a common law marriage.·*   Proof of those circumstances which almost universally attend the marriage state, or which are always expected to attend it, is highly important in attempting to establish a marriage without ceremony.

8. SAME—*admissions of one since deceased carefully scrutinized.*   Evidence of admissions made by a person since deceased will be closely scrutinized and the circumstances under which they are alleged to have been made carefully considered.

9. SAME—*when letters are admissible as res gestœ.*   Where a complainant is seeking to establish her marriage to a party since deceased, letters written after the alleged marriage, in his handwriting and bearing his signature, found among his papers, enclosed in envelopes stamped and postmarked, and addressed in his handwriting to the complainant under a name other than as his wife, are admissible, without proof that complainant received them, as part of the *res gestœ*, to show how deceased then regarded her.

APPEAL from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

GALLOWAY & TRAUB, for appellants:

The burden of proof is upon the party asserting the marriage.   *Arnold* v. *Chesebrough*, 58 Fed. Rep. 833.

Both cohabitation and reputation "as husband and wife" must be shown to prove the marriage status.   Cohabitation must be matrimonial, and not meretricious. Repute must not be divided, but open and general, and prevail among the friends and relatives of both parties. 1 Bishop on Marriage, Div. and Sep. secs. 935, 936, 939; *Hiler* v. *People*, 156 Ill. 511; *Cartwright* v. *McGown*, 121 id. 388; *Port* v. *Port*, 70 id. 484; *Hebblethwaite* v. *Hepworth*, 98 id. 126; *Yardley's Estate*, 75 Pa. St. 207; *Bicking's Appeal*, 2 Brewst. 202; *Sharon* v. *Sharon*, 79 Cal. 633; *Arnold* v. *Chese-*

*brough,* 58 Fed. Rep. 833; *Clayton* v. *Wardell,* 4 Comst. 230; *Brinkley* v. *Brinkley,* 50 N. Y. 184.

Evidence of alleged admissions by a deceased person should be received with great caution, as such evidence is the most dangerous that can be admitted and the most liable to abuse. *Bragg* v. *Geddes,* 93 Ill. 39; *Cunningham* v. *Burdell,* 4 Bradf. 343.

Appellee should not have been allowed to testify against appellants when defending as heirs of Henry Laurence, deceased. Starr & Cur. Stat. chap. 51, sec. 2; *Stone* v. *Cook,* 79 Ill. 424.

Where there is no proof of the law of another State, nor judicial knowledge, which would raise a presumption that the common law prevails there, it will be presumed that the law of the forum is the law of that State. *Kennebrew* v. *S. A. E. S. M. Co.* 17 So. Rep. 545; *Brown* v. *Wright,* 22 S. W. Rep. 1022; *Brag* v. *Cumming,* 17 Martin, 252; *Scroggin* v. *McClelland,* 37 Neb. 644; *Meuer* v. *Railway Co.* 59 N. W. Rep. 945.

Courts will not presume the existence of marriage laws different from those of the forum. Am. & Eng. Ency. of Law, 531; *State* v. *Patterson,* 2 Ired. 346.

ANDERSON & PROUDFOOT, for appellee:

The marriage contract is a civil contract *jure gentium,* to the validity of which the consent of parties able to contract is all that is required by natural or public law. 2 Greenleaf on Evidence, sec. 460.

An agreement to take each other as husband and wife, followed by cohabitation, is a valid marriage. *Thomas* v. *Holtzman,* 7 Mackey, 62; *Clayton* v. *Wardell,* 4 N. Y. 230; *Rose* v. *Clark,* 8 Paige, 574; *Jackson* v. *Winne,* 7 Wend. 47; *Cheney* v. *Arnold,* 15 N. Y. 351.

All persons living together as husband and wife are presumed to have intended entering into the marriage state. Bishop on Marriage and Divorce, chap. 8; *Myatt* v. *Myatt,* 44 Ill. 473.

The presumption of marriage from cohabitation apparently matrimonial is one of the strongest known to the law, and this presumption can be repelled only by the most cogent and satisfactory evidence. *Blair* v. *Howell*, 68 Iowa, 619; *Hynes* v. *McDermot*, 91 N. Y. 451; *Betsinger* v. *Chapman*, 88 id. 487; *Camden* v. *Belgrade*, 75 Me. 126; *Teter* v. *Teter*, 101 Ind. 129; *Morris* v. *Davis*, 5 C. & F. 163; *Piers* v. *Piers*, 2 H. L. Cas. 331.

Evidence that a woman occupies the same bed with the defendant in his tenement, and was seen getting dinner and performing other household duties there in his absence, is competent to prove her to be his wife. *Commonwealth* v. *Hurley*, 14 Gray, 411; 2 Greenleaf on Evidence, sec. 462, note *a*.

The declarations of the deceased are admissible to prove his common law marriage with complainant. *Greenawalt* v. *McEnelly*, 85 Pa. St. 352; *Shorten* v. *Judd*, 42 Pac. Rep. 337.

An agreement to keep the marriage secret will not invalidate it, neither will it necessarily involve in doubt the proofs of its existence. 1 Bishop on Marriage and Divorce, secs. 252, 488; *Dalrymple* v. *Dalrymple*, 4 Eng. Ecc. 485; *Swift* v. *Kelley*, 3 Knapp, 257.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

This is an appeal from the Superior Court of Cook county, where appellee had filed her bill against appellants and others praying for a partition of the estate of Henry Laurence, who died intestate in Chicago in March, 1891. He had resided in Chicago since the year 1877. Appellants were the heirs-at-law of Henry Laurence. Appellee claimed by her bill to be the lawful widow of the intestate, and he having died leaving no issue, she claimed to be entitled, by the laws of descent, to one-half of the real estate and all the personal estate, after the payment of debts. Answers denying the allegations of

the bill and replications thereto were filed, and the cause was heard by the chancellor upon the oral testimony and depositions of the witnesses.   The court found the equities with appellee, and found that in the month of May, 1869, she became and was the lawful wife of Henry Laurence, deceased, and so continued up to the time of his death, and found that as his lawful widow she was entitled to share in his estate, and so decreed.

No celebration of a marriage is claimed, but the bill charges that on or about the first day of May, 1869, in the city of New Orleans, in the State of Louisiana, the deceased agreed to be the husband of appellee and appellee agreed to be his wife, and that in pursuance thereof the deceased and appellee then and there became husband and wife, and so lived and cohabited up to his death.

Before considering the evidence, which involves the single question whether the appellee is the lawful widow of the deceased, some of the legal propositions presented by appellants, and which are necessary to the determination of the case, should be considered.   Appellants insist that in the absence of proof of the marriage laws of the State of Louisiana the law of the forum applies, and that by a statute of this State then in force the marriage would be void.   The appellee relies upon proof of a contract of marriage *per verba de presenti*, claiming it to have been entered into in the State of Louisiana, in 1869.

The evidence shows that the deceased was a white man and she a woman of color.   What the law of the State of Louisiana then was respecting marriages at common law or marriages between white and colored persons is not disclosed.   Whatever may be the rule governing other contracts, the contract of marriage is a contract *jure gentium,* and consent and the assumption of the marriage status are all that is required by natural or public law.   In the absence of local restrictions or regulations these parties were capable of contracting marriage as of common right.   Restrictions or conditions imposed

upon the right to contract marriage are exceptional, and if the evidence establishes a contract of marriage *per verba de presenti*, and it is claimed that it falls within such condition or restriction, the burden is upon the party so claiming to show it. Bishop on Marriage and Divorce, 521-528; *Hutchins* v. *Kinemel*, 31 Mich. 126.

It is urged by appellants that the court erred in permitting appellee to testify in her own behalf, over their objection, for the reason that they were defending as the heirs-at-law of Henry Laurence. Section 1 of the statute entitled "Evidence and Depositions" removes the disqualification of a witness which existed at common law by reason of any interest in the event of the suit, as a party or otherwise. Section 2, however, provides that "no party to any civil action, suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein of his own motion or in his own behalf, by virtue of the foregoing section, when any adverse party sues or defends as the * * * heir * * * of any deceased person, * * * unless when called as a witness by such adverse party so suing or defending." The appellee was allowed to testify to the alleged fact of marriage and to other facts as tending to show that the marriage relation existed between the deceased and herself. Was this ruling of the court proper under section 2 above quoted?

It is contended by appellee that she sued in this proceeding as an heir of the deceased, and that under the rule as laid down by this court in *Pigg* v. *Carroll*, 89 Ill. 205, she was a competent witness. By her bill, in which she conceded that appellants were the heirs of the deceased, appellee alleged that she was also an heir and entitled to all of the personal and one-half of the real estate of the deceased and to dower in the remainder of the real estate, because, as she alleged, she had been married to the deceased and was therefore his lawful widow. These allegations were not conceded or admit-

ted by the heirs, but were expressly denied by them. In order to establish her right to share in the distribution of the estate she must first establish the marriage, and until then she is not the heir and not entitled to share in the estate.

In the case of *Pigg* v. *Carroll, supra,* there was a controversy among heirs over the distribution of an estate where the value of certain advancements to several children of a deceased person were in dispute; but as said in the opinion in *Comer* v. *Comer,* 119 Ill. 170, in commenting on the case of *Pigg* v. *Carroll,* "the parties litigant held title derived from the same identical source, and the litigation concerned property it was conceded belonged to parties to the suit." The rule in *Pigg* v. *Carroll* was further explained in *Mueller* v. *Rebhan,* 94 Ill. 142, and in *Ebert* v. *Gerding,* 116 id. 216, where it was said that the statute "was intended to protect the estates of deceased persons from the assaults of strangers, and relates to proceedings wherein the decision sought by the party testifying would tend to reduce or impair the estate." The rule to be deduced from these cases is, that where, among those who are conceded to be the heirs, there arises a controversy as to the distribution of the estate among them, they may testify, as such testimony does not tend to reduce or impair the estate among them. Appellee was not an heir until she established the marriage which she alleged and which was denied by the heirs, and until such marriage was established by proof or conceded she was a stranger to the estate and incompetent to testify, and the court erred in permitting her to do so, over appellants' objection.

In the case of *Brown* v. *Brown,* 142 Ill. 409, not referred to by counsel in this case, it was held that where there was no record of a marriage required to be kept, and where the justice and all persons present at the marriage were dead, the wife is a competent witness to establish the fact of marriage. It does not appear that the ques-

tion of the competency of the witness was raised in that case, and so far as the views there expressed are not in harmony with the views expressed in this opinion they are overruled.

It is necessary to a valid marriage that both parties should consent to the marriage agreement and assume the marriage status. (Bishop on Marriage and Divorce, 521-528; *Hutchins* v. *Kinemel,* 31 Mich. 126.) It is impossible to fix a standard by which the evidence of a marriage in every case should be measured. Each case must depend upon its own facts and attending circumstances. Those circumstances or shadows which usually attend the lives of those who have assumed the marriage relation are important in determining the question of whether a marriage does or does not exist. The conduct and bearing of the parties are regarded by their friends and relatives and by those with whom they associate. Introducing each other as husband and wife, and holding each other out to the world as such, are circumstances of more or less weight, as they have relation to the length of time the parties have lived together, and the like. These are circumstances or shadows which we know, by observation, almost universally attend the married state and are always expected to attend it, and their presence or absence is highly important in determining whether a marriage without ceremony has been entered into. To ignore them would open the door to fraud and imposition, invite perjury, threaten the legitimacy of children and the rights of heirs, and endanger the social fabric which rests on the institution of marriage. Marriage will sometimes be presumed from cohabitation. But this presumption may be overcome, as cohabitation may be, and frequently is, meretricious as well as matrimonial.

There are many contradictions appearing in the testimony of some of the witnesses as to statements and conversations in the past, and it is impossible, within

the limits of an opinion, to point out in detail these contradictions or wherein witnesses are corroborated.

It appears from this evidence that prior to the war of the rebellion the appellee, then named Maria Lewis, was a slave in Yazoo City, Miss., where a man named Evans purchased her and on the 2d of April, 1846, set her free. She and Evans removed from Yazoo City to New Orleans in 1859, where for many years afterwards she kept a house where she let furnished rooms. Evans, when he died, left her $15,000. Dr. Laurence, the deceased, knew Evans and appellee well in Yazoo City, where he practiced the profession of a dentist, the appellee looking after his office there. Dr. Laurence left there in 1863 and went to Chicago, and in 1864 went to New Orleans and engaged in the practice of his profession, where he remained until 1877, when he removed to Chicago. Before going to New Orleans, in 1864, he had some correspondence with Evans, and borrowed some money from him after he reached there, to aid him in starting in business. He roomed at the house of appellee from the time he went to New Orleans until in 1869, when he moved his office into a building at 12 Baronne street, (the appellee keeping furnished rooms in the remainder of the house,) where he and appellee continued to reside until they removed to Chicago, in 1877, where they lived in the same house at 3029 Forest avenue until his death, in 1891. Dr. Laurence owned slaves in Yazoo City before the war.

To establish the marriage relation the appellee introduced a number of witnesses to prove admissions made by Dr. Laurence, and conversations had with him concerning his relations with appellee. These admissions and conversations are said to have occurred from time to time from 1870 down to a time shortly before his death. The witness Maria Harvey says that in 1870 he told her that he and appellee had agreed to live together as husband and wife for life. Agnes Dennian states that in the

summer of 1890 he introduced appellee to her as his wife. Louise Smith says that he called appellee his wife, in speaking of her, in 1887 or 1888. Appellee was then ill, and the witness was attending her as a nurse. Camilla Kaley, Kate L. Smith, (a cousin of appellee,) and Josephine Jones, all testify to conversations with him at various times in which he spoke of appellee as his wife. Camilla Kaley also states that in her presence he addressed appellee as his wife, and Josephine Jones states that in 1881 he told her that he and appellee had made an agreement to live together as husband and wife. Kittie Bennett testifies that many years ago he introduced appellee to her as his wife; that witness lived in the same house with them in Chicago, and that they occupied the same bed and ate at the same table, and that he and appellee had pledged to marry themselves and live together until death parted them. These witnesses, and others, testify to the fact that they cohabited, and to facts from which cohabitation may be inferred. They also testify to other facts which show their relations to have been more intimate than should obtain between unmarried persons; also to admissions by Dr. Laurence that he had been greatly aided by the means furnished him by appellee.

It appears that the witnesses who testify to these admissions and conversations were neither relatives, nor associates, nor persons with whom Dr. Laurence had any intimate acquaintance. Some of them were colored persons, and some of them were persons with whom he could have had scarcely any acquaintance. His relations with appellee, whether matrimonial or otherwise, were never disclosed by him to his intimate friends and relatives, except that he expressed himself, on more than one occasion, as being opposed to the marriage state, and that he preferred his manner of life. If prudential reasons, as suggested by counsel for appellee, forbade these disclosures to his intimates and relatives, it is difficult to under-

stand why he should voluntarily disclose his secret to those with whom he had but a slight acquaintance and who had no inducement to keep his secrets. Evidence of admissions made by a person since dead should be carefully scrutinized, and the circumstances under which they were alleged to have been made carefully considered with all the evidence in the case. Such evidence is liable to abuse.

The relations of these parties were peculiar. They resided together many years. Dr. Laurence, prior to 1870, had been investing his earnings, which had been considerable, in Chicago real estate, and in 1867 and 1868 had large balances in the Union National Bank there. Of the money appellee received from Evans, Dr. Laurence in 1870 borrowed $7000, giving his obligation therefor, which money was probably invested there. In this obligation he provides for payment to her in case she survives him; if not, the obligation to be void. This transaction was never disclosed by either of them during life, except inferentially by him that she had helped him. She purchased a piece of property in Chicago and conveyed to him two-thirds of it, which they held as tenants in common. Notwithstanding these intimate relations and the evidence of the witnesses who testify to admissions of the deceased, is the evidence sufficient to establish the fact that they consented to be husband and wife and that they assumed the marriage status?

There is nowhere in this record any evidence that during the quarter of a century the appellee lived with the deceased she ever claimed to be his wife, either by word or act. During this period, either in his presence or in his absence, she did not claim to be his wife. She occupied the position of a servant or housekeeper,—not of a wife. While she was on terms of intimacy with him, she did not occupy or assume to occupy the position of a wife. Although he had ample means, no servant was ever employed except when she was unable to do the

work. She did it, and while she ate with him when others were not present, she usually waited upon the table in the garb of a servant. His associates were with white people, hers with colored people. He did not escort her or accompany her as a husband. She did not demand it or seem to expect it. Some of the evidence shows she complained of not receiving enough wages. She took in washing to earn money. She was known generally as and called by the name of Mrs. Evans, to which she did not object. So far as all the relatives, friends and associates of Dr. Laurence could observe he always treated her as a housekeeper—never as a wife. He introduced her to them as his housekeeper, "Mrs. Evans." This course of conduct continued through a period of more than twenty years, in New Orleans and Chicago, and long after there were any prudential reasons for this course, the deceased having ceased his practice as a dentist several years before his death. The obligation given her by Dr. Laurence was made after the alleged marriage, yet the obligation is made payable to "Maria Evans," when by its terms it was not payable to her until his death. There could be no prudential reason why she should have accepted this paper payable to her by the name of "Evans" instead of "Laurence." In 1880 property was conveyed to appellee by the name of "Maria Evans," upon which she executed a trust deed by such name. In the same year she executed a deed, by the name of "Maria Evans," to the deceased, in which she recites that she is unmarried. After the death of Dr. Laurence, appellee, by the name of Maria Evans, filed her claim against his estate. As a reason for this she states that she thought that the name was as good as any.

It would be useless to extend the consideration of the evidence further. The evidence falls short of establishing the necessary elements of a common law marriage,—that of consent and assumption of the marriage status.

The great weight of the evidence shows that neither of the parties assumed such relation toward the other.

Error is assigned by appellants upon the refusal of the court to admit in evidence their letter exhibits "1," "2," "3" and "4." These letters purport to have been written during the month of October, 1873. They were signed by the deceased and were in his handwriting and were enclosed in envelopes directed in his handwriting to "Mrs. Maria Evans, 16 Dauphine st., New Orleans." Each envelope bore a postage stamp, and was postmarked "Chicago, Ill.," during that month. The letters and envelopes were in the possession of William J. Laurence, who took possession of all the papers of the deceased. It was error to exclude these letters. They were admissible as parts of the *res gestæ* to show how the deceased regarded the appellee, and it was not essential to prove the letters were received by her before admitting them.

For the errors herein indicated the cause is reversed, and remanded to the Superior Court of Cook county for trial in conformity with the views expressed in this opinion.

*Reversed and remanded.*