MINNEOLA WORDEN CRUMLEY

*v.*

ANNA LOUISE WORDEN.

201  105
e210 ¹169

*Opinion filed February 18, 1903.*

1. EVIDENCE—*when complainant in partition is incompetent as witness.*
Complainant in partition who alleges that she and the defendant
are the daughters of the deceased land owner is incompetent to
testify in her own behalf as to facts tending to show her relation,
as an heir, to the estate, where such fact is a controverted ques-
tion in the case.

2. DESCENT—*child merely raised in the family cannot inherit.* A child
taken by a husband and wife and raised and treated by them as
their daughter, but not legally adopted by them, cannot inherit
from them as an heir.

APPEAL from the Circuit Court of Warren county; the
Hon. GEORGE W. THOMPSON, Judge, presiding.

KIDDER & KIDDER, and JAMES A. MCKENZIE, for ap-
pellant.

GRIER & STEWART, for appellee.

Mr. JUSTICE RICKS delivered the opinion of the court:

Complainant filed her bill for partition of certain real
estate owned by John J. Worden, deceased, and made
Anna Louise Worden defendant to the same.   The bill
alleges that the complainant, Minneola Worden Crum-
ley, and Anna Louise Worden, are the only children and
heirs-at-law of one John J. Worden, deceased, and com-
plainant is entitled to partition of certain real estate in
Warren county.   The defendant's answer denies com-
plainant is the daughter of John J. Worden, and denies
that she has any right to partition of or interest in said
real estate.   Issue joined by replication to answer so
filed.   The cause was heard by the chancellor in open
court, without a reference to the master, upon oral tes-
timony and documentary evidence, and the chancellor en-

tered a decree dismissing complainant's bill, from which she prosecutes this appeal.

The bill alleges, and the answer shows, that Anna Louise Worden, the appellee, is the daughter of John J. Worden by his second wife, his first wife having died during the year 1880. Complainant, to prove her heirship, introduced evidence of witnesses showing that she was brought up in the family of John J. Worden, and was recognized and held out by both him and his wife as being their daughter. She also introduced in evidence certain letters addressed to her in the handwriting of John J. Worden, bearing date between July 31, 1895, and March 24, 1899, in which he signs his name as "Papa," etc. There was also introduced a marriage invitation of date 1890, in which Mr. and Mrs. J. J. Worden extend invitation to the "marriage of their daughter, Minneola;" also a bible presented to the complainant, on the fly-leaf of which appear the words, "Minneola E. Worden, from father and mother," dated December 25, 1887, which inscription is conceded to be in the handwriting of Worden's second wife; also the family record contained in the family bible, in which appears under the head of births, "Minneola E. Worden was born October 1, 1878." The record also shows that there was offered in evidence a part of a family record in a bible conceded to have been the family bible of John J. Worden and Elizabeth Worden, his wife, in the record of births of which appears: "Minneola Elizabeth, adopted daughter of John J. and Elizabeth Worden, was born October 1, 1868."

A. A. Cornell, a witness for complainant, testified that he was acquainted with Worden and his wife, Elizabeth, and also acquainted with his second wife, Anna; that the Worden family visited his family and brought the children to his house; that there was nothing said about whose children they were; that there were two children that Worden called his; that witness lived one and a half miles from Worden; that he knew Elizabeth Worden up

to the time of her death, in 1880, and knew Minneola, the complainant, during the life of Elizabeth; that he never knew of Elizabeth Worden being confined; that when he first knew Minneola she was an infant in arms, but he could not say whether she was walking or creeping when he first saw her; that he was invited to the wedding of complainant, and the wedding invitation offered in evidence was the one received by him.

E. H. Soule, complainant's witness, testified that he was acquainted with complainant from the time she was a little girl; that he worked for Worden from the time he was fourteen or fifteen years old, and that he was forty-eight years old; that when complainant was a little girl, going to school, he was at Worden's house and complainant came home from school crying, and Mrs. Worden asked her what was the trouble, and she said that some of the girls at school told her that she had no parents,— that Mr. and Mrs. Worden were not her parents; that Mrs. Worden told her not to pay any attention to what the children said; that she was their child and that they were her parents, and if the children again accused her of not having any parents, to tell them that they did not have any parents; that these children were bad, and to not pay any attention to what they said. This witness further testified that he worked both by the day and the month,—sometimes one and sometimes the other,—for Mr. Worden, and that he slept and boarded with the Worden family; that he lived a close neighbor from the time he was a little boy until the Wordens went to New York State, in the year 1881; that he worked at Worden's during the year preceding the arrival of complainant at the Worden house; that the first time he saw complainant at Worden's she was one and a half years old, and to his best recollection was walking; that he had worked there just recently before he saw this child but had not seen complainant there before; that the first time he saw complainant he saw her at Johnson's,—an old gentleman

who came to that part of the country from New York, and who lived about forty rods north of Worden's, in a tenant house belonging to Worden; that he was working at Worden's when he first saw the child at Johnson's; that he did not know that he ever heard that Mr. and Mrs. Worden ever had a child, and never saw anything in the appearance of Mrs. Worden that indicated she would soon give birth to a child; that he first saw the child at Johnson's and the next place he saw it was at Worden's; that he thinks the time that he first saw the child was about 1872.

Andrew Johnson testified, for complainant, that he knew John J. Worden and Elizabeth, his wife, and that their families visited back and forth; that witness moved to Illinois in 1869 from New York and settled two miles from Worden's. This witness also relates the scene of the little girl coming home from school crying, and telling Mrs. Worden that the children at school said she had no parents, and says complainant asked Mrs. Worden if she was not her child, and that Mrs. Worden replied that she was her child,—that they were her father and mother. He says that the first time he heard Mrs. Worden speak of Minneola was when she was between one and two years old, and that Mrs. Worden then said that she was her girl. Witness further states that his parents had preceded him to Illinois, and in the early summer of 1870 moved into the Worden house,—a house about thirty-five rods north of Worden's residence,—and that he frequently visited his parents while they lived there; that he first saw this child at the home of his parents in 1870; that his father was eighty-five years old and his mother sixty-five, and that the child did not belong to his father's family; that when he first saw her there she was beginning to walk and get up by chairs; that the child staid at his mother's from three to six days; that his mother took care of her, and that she went from there to Worden's, and that she remained at Worden's from that time

on to her marriage; that when he saw her at his mother's she had only a little dress and was bare-footed; that he worked frequently for Mr. Worden and saw the child frequently as she grew up, and that she was known as Minneola, or Minnie. At the time of the trial he said he had not seen complainant for a number of years and did not recognize her when he saw her, but had no doubt but that she was the same child that he had spoken of above.

Martha Booth, for complainant, testified that she was a sister to Elizabeth Worden, the first wife of John J. Worden; that the first time she saw complainant was at her sister Elizabeth's home; that she was a small child when she first saw her; that witness lived four miles from Worden's and saw her sister frequently each year, but could not tell how often; that her sister was about eight years older than herself; that their mother died when both were young, and that Mrs. Worden occupied the place of both mother and sister to witness; that she saw her sister sometimes once a week and sometimes once a month, and that her sister, Mrs. Elizabeth Worden, never had a living child.

This was practically all the evidence offered on behalf of complainant. On behalf of the defendant, Debora Beckner testified that she was seventy-five years old, and had lived in Swan township, county of Warren, thirty-six years and within eighty rods of the Worden farm and attended the same church with the Wordens; that Mrs. Worden never had a child, that she knew of; that she never saw her when she indicated she was likely to have a child; that she saw her once a week; that the first time she knew of complainant, a woman by the name of Emeline Bowlin came to her house carrying complainant and claimed to be complainant's mother and applied for work; that witness refused to employ her because she had a child; that Emeline Bowlin was walking when she came and walked away; that the child was then about a year old; that she talked with Mrs. Worden about com-

plainant twice, first while complainant was at Johnson's and before she had come to Worden's home; that Mrs. Worden told her that there was a little girl down at Johnson's; that her husband, Mr. Worden, had been to see the child and had said to her: "You go and see the child; it is a pretty little girl, and if you like it we will take it and raise it;" that shortly after she was again at Worden's and the child was there, and Mrs. Worden said to her, "We have taken this child, and if she proves to be a good girl we are going to have her adopted."

Mary Johnson testified that she was sixty-four years old; that she came from New York in 1869 and located two miles from the Worden farm; that she was the wife of the witness A. Johnson, who testified on behalf of the complainant; that her husband's parents lived near Worden's, in a house a few rods north of the latter; that the next summer after they came to Illinois she saw a child at the Johnson house,—the house of her father-in-law; that the child was Minneola, complainant; that she was a small child, bare-footed and poorly dressed; that she was not one of the Johnson children; that Mrs. Johnson was taking care of her; that she had worked at Worden's doing housework that year before she saw this child and that there was no child then at Worden's; that the next Sunday after she saw the child at Johnson's she saw her at a church being held in a school house and the Wordens had her; that she found her at the Wordens after that, and that they treated her nicely and as their own child.

Jane Newburn testified that she was fifty-five years old; that she was a sister to A. Johnson, a witness for complainant; that she came to Illinois with her parents a year earlier than her brother did and worked around for various families, among them, for the Wordens; that she saw a child at her father's house that appeared to be one and a half or two years old; that the witness' mother was taking care of the child; that she was brought there

by a woman named Emeline Bowlin, and stayed at her mother's two weeks, and that witness and her mother took care of the child; that she took the child from there to Worden's and said to Mrs. Worden: "There has been a poor woman at our house with a child; this is the child she brought to our house, and she wanted a place to work and nobody would have her with this child;" that she had other conversations with them about it, and that shortly after, the mother of the child came and had a talk with the Wordens, in which the Wordens said to the mother: "Would you like to leave it here a couple of weeks to see what we think of her?" that the mother said, "Yes, if you won't charge me board;" that the Wordens replied that they would not charge board, and for her to come back in two weeks and see if they were satisfied. Witness testified that on the day set the mother did not return for the child; that the child took sick about the end of the two weeks and that witness stayed there and nursed her, and that that child was Minneola, the complainant; that on the Sunday following the expiration of the two weeks the mother came and said to Mr. and Mrs. Worden, "Don't you think you can take this child as your own?" that Mrs. Worden said: "When she gets old enough to have company of her own she may make me trouble; we don't know what blood is in her veins, and I am in no hurry; we will wait; when she gets old enough to see if she cares and loves me properly we will adopt the child and she can have our property." Witness further stated that she stayed in that neighborhood until complainant was about eight years old, and that complainant remained with the Wordens and was called Minneola. She also stated that the Wordens required her to promise that as long as she lived she would not tell complainant that they were not her own father and mother.

John T. Reid, aged sixty-eight, testified, for defendant, that he became acquainted with Capt. Worden and

his wife in 1857; that he lived about five miles from them and saw them frequently until Worden went away; that he never knew that Mrs. Worden had a child; that he never heard of her having a child and never saw her when her condition indicated she was likely to have a child. This witness further testified that Worden was a good business man and lived well, and was regarded as wealthy in that community.

Mrs. Anixine Stice testified she lived about three-quarters of a mile from the Wordens from 1850 to 1878; that she knew Mrs. Worden and saw her frequently at gatherings during their acquaintance; that she never heard of her giving birth to a child and never observed her when her condition indicated that she would give birth to a child; that the first time she ever saw a child about their place was about 1870, and that the child was then two or three years old.

H. M. Soule, aged eighty, testified that he had lived in Swan township forty-six years, seven years of the time within half a mile of the Worden farm; that he worked for Worden and rented land of him, and knew his wife and did not know of her having a child; that he knew complainant, Minneola, as she grew up; that he first saw a little girl at Johnson's, and shortly afterwards he saw a little child at Worden's that they called Minneola Worden; that when he first saw the child it was about one and a half years old, but that he could not say positively that the child he saw at Johnson's was the one he saw at Worden's.

Henrietta Arnold, aged fifty, testified that a number of years ago,—she could not tell how many,—she saw a child at Johnson's which appeared to be between one and two years old, and that a few weeks afterwards she saw the same child at Worden's, and knew the child as she grew up as Minneola Worden, the complainant; that she recognized the baby that was at Worden's as the same one she saw at Johnson's; that she had been ac-

quainted with the Worden family from the time she was four years old.

Andrew Johnson was re-called, and testified that he never saw but the one child at his parents' house while they lived on the Worden farm.

D. P. Witter testified that he was a brother to Worden's second wife; that Worden married witness' sister April 13, 1881, and in the fall of that year they moved to Binghampton, New York, where the second Mrs. Worden died, in 1895; that Worden then moved to Batavia, New York, for the purpose of giving Louise, his blind daughter, the benefit of an institution located there; that he administered on the estate of Worden and was guardian of Louise.

Complainant went upon the stand and offered to testify to matters that transpired during the life of John J. Worden with reference to certain entries in the record contained in the bible relative to herself. Her testimony was objected to by appellee on the ground that appellee was defending as an heir of John J. Worden, and the objection was sustained and her testimony excluded. To this ruling complaint is made, and should, before considering the effect of the testimony, be disposed of. We think there was no error in the ruling of the court in the regard complained of. We had this question under consideration in *Laurence* v. *Laurence*, 164 Ill. 367. In that case the complainant filed her bill claiming to be the common law wife of one Henry Laurence, who had died intestate and without issue, and she claimed that by virtue of such marriage she was, under the statute, his heir to one-half of his lands and all of the personal property after the payment of debts. His collateral heirs were made defendants to the bill. She offered herself as a witness to testify to the marriage. Objection was interposed, and her testimony was admitted over objection. For this error we reversed the case, and there, after reviewing other cases upon the subject, announced the rule

201—8

as follows (p. 373): "The rule to be deduced from these cases is, that where, among those who are conceded to be the heirs, there arises a controversy as to the distribution of the estate among them, they may testify, as such testimony does not tend to reduce or impair the estate among them. Appellee was not an heir until she established the marriage which she alleged and which was denied by the heirs, and until such marriage was established by proof, or conceded, she was a stranger to the estate and incompetent to testify, and the court erred in permitting her to do so over appellant's objection." So in the case at bar, appellant filed her bill and claimed to be a child and heir of John J. Worden. Appellee answered, denying that she was either a child or an heir of John J. Worden. That was the question before the court. The distribution of the land, and the title to it as intestate estate of John J. Worden, were not the only questions. So long as appellant's relation to the estate as heir was a controverted question she was incompetent as a witness, on her own motion and against the objection of appellee, to testify touching that subject or matters tending to prove or disprove that issue.

From a review of this record and the examination of the letters and various documents offered in evidence there can be no doubt in the mind of the court that Mr. Worden held complainant in very high esteem,—in fact, regarded her with the same affection as though she were his child. The letters introduced in evidence all show that his affection for her was a real one. Every one of them, when addressed to her alone, were to "My Dear Daughter Minneola." Most of them were addressed to her and her husband, as "Dear Minnie and Edward," and all of them, whether addressed to complainant alone or to herself and husband, concluded with the expression, "Your papa." All these letters were written after the death of Elizabeth, the first wife of Mr. Worden, and most of them, or at least a number of them, while the

second wife was living. In these letters Mr. Worden speaks of his second wife as the mother of complainant, calling her, variously, "mama" and "mother," and when the second wife was approaching death after a lingering illness, a postscript was added to one of the letters of Mr. Worden in the handwriting of his second wife, and signed simply "Mother."

It will be observed with reference to the invitation to the wedding, which took place during the year 1890 and during the life of Mr. Worden's second wife, that according to the invitation to that wedding complainant was the daughter of the then Mr. and Mrs. J. J. Worden. The same idea is carried out in the inscription on the first page of the bible presented to complainant in December, 1887, which contained the words, "Minneola E. Worden, from father and mother." Two entries from the Worden family bible, as to the birth of complainant, were offered in evidence. One contained the simple statement, "Minneola Worden was born October 1, 1878." The other one went into more detail, and stated, "Minneola Elizabeth, adopted daughter of John J. and Elizabeth Worden, was born October 1, 1868." The bible itself, containing these entries, is before us, except that we are unable to find the sheet or page containing the last entry. Complainant insists that this entry, as originally made, instead of containing the word "adopted" contained the word "only," and was written in purple ink and was afterwards changed by being written over with brown ink and the word "only" erased and the word "adopted" written in its stead. The evidence does not show who wrote the entry of birth first mentioned, wherein it was said that complainant was born in 1878, and the witnesses differ as to the fact in whose hand the writing relative to the birth was that was said to be changed. We are unable to say from the evidence who did write or make these entries. Nor was there anything in the writings themselves, or in the record, by which it can be ascer-

tained when they were written. It is conceded by both parties that the entry giving the birth of complainant as 1878 was an error, and that she was born about 1868. But if it be conceded that all of these entries were in the handwriting of John J. Worden, we would still be bound, under the evidence above mentioned, to hold that the court properly dismissed complainant's bill.

Sufficient has been said with reference to the letters, and the language of endearment used in them, to show that the Worden family were people of kindly hearts, and that the step-mother, if this complainant could be the daughter of Worden by his first wife, Elizabeth, used the same terms of endearment and addressed the complainant as though she were her own daughter. This fact takes from these letters, in the light of the circumstances, the probative force they might otherwise have as to parentage. It may be truthfully said that all of the documentary evidence offered in the case, except the two entries in the register of births, would have as much, or more, tendency to show that the complainant was the daughter of the second wife of John J. Worden as they would to show that she was the daughter of his first wife. And we may say as to the supposed change in the register of births by striking out the word "only" and putting in the word "adopted," if it be conceded that the original entry was in the handwriting of John J. Worden, the evidence amply shows that it was not true. Complainant in her bill alleges that he left Louise Worden, and it may be that at the time that entry was made John J. Worden had no other child and expected to have no other than this complainant, and that after Louise was born he saw fit to change the record to show the facts, and did so change it that she appear not as the only child, which was then incorrect, but as his adopted child. The term "adopted child," while in the law it has a strict significance and presumes some form of legal procedure, in common parlance and as used by the masses is very

frequently applied to a child simply taken into a family and raised as was this complainant.

There can be no doubt in the mind of any one reading this evidence that complainant was not the child of the bodies of John J. and Elizabeth Worden. Elizabeth Worden had been married to John Moulton in 1847. He died in 1851 and she married John J. Worden in 1853. Her sister and all the neighbors that knew her say that she never had a child to their knowledge, nor was she ever in a condition that suggested the likelihood of her being with child. Not a single witness introduced by complainant or defendant testifies that Elizabeth Worden was ever pregnant or delivered of a child. In fact, all the witnesses introduced by complainant, who personally knew Elizabeth Worden, testify that she never had a child, and most of the witnesses who have any personal knowledge of the facts at all give the same version of the origin of complainant that is given by defendant's witnesses, substantially all tracing her from the Johnson family to the Wordens when she was not much more than a year old. Not a doctor, midwife, neighbor, servant or anybody else who was acquainted with Mrs. Worden and met her, either in church society or general society or at her home, says that she ever had a child or that she was ever pregnant, or that they ever heard of her being delivered of child.

Under complainant's contention she was born of the bodies of Elizabeth and John J. Worden. There is no sort of claim urged here that there was ever any legal adoption of complainant by the Wordens as their child, nor is there any evidence in the record, other than the quotation from the birth register, tending to show it. With such evidence before us we feel that there is nothing left for us to do but to affirm the decree of the circuit court in dismissing complainant's bill.

*Decree affirmed.*