## Nicholas Doubet et al., Appellees, v. Joseph Doubet et al., Joseph Doubet and Cecily Dorenbus, Appellants.

### Gen. No. 5,787.

1. WITNESSES, § 66*—*test as to interest of witness.* The real and not apparent interest of a witness is the test by which to determine whether he is testifying against his interest or not.

2. WITNESSES, § 98*—*when heirs are competent witnesses.* On bill for partition between the heirs at law, where the question in dispute was as to how much should be charged some of the heirs for the use and occupation of the premises for the year following the death of the intestate, and such heirs claimed the occupation of the premises under verbal leases from the intestate, *held* that they were competent to testify for themselves and for each other to establish the oral leases.

3. FRAUDS, STATUTE OF, § 41*—*effect on verbal leases.* A contract of leasing, void under the statute of frauds, may yet be carried out by the parties in interest and they are then bound thereby.

4. FRAUDS, STATUTE OF, § 107*—*what constitutes part performance to take verbal leases out of statute.* Where sons, under verbal leases of lands from their father for a year commencing the next spring, plowed portions thereof in the fall under the direction of their father as to the kinds of crops to be planted, and sublet portions to other persons who plowed and sowed certain portions to wheat, and the father died late in December, *held* that there was such a part performance as to take the verbal leases out of the statute of frauds, and that the lease was binding on the heirs.

5. LANDLORD AND TENANT, § 324*—*when lease void under statute of frauds competent to ascertain rent to be paid.* Although an original verbal lease is void under the statute of frauds, yet if the tenant occupies the premises under such lease, such verbal agreement is competent evidence for the purpose of ascertaining the rent to be paid.

Appeal from the Circuit Court of Peoria county; the Hon. LESLIE D. PUTERBAUGH, Judge, presiding. Heard in this court at the October term, 1913. Affirmed. Opinion filed April 15, 1914.

*See Illinois Notes Digest, Vols. XI to XV and Cumulative Quarterly, same topic and section number.

SHEEN & GALBRAITH and CAMERON & CAMERON, for appellants.

GLEN CAMERON, for cross-appellants.

COVEY, CAMPBELL & COVEY, for appellees Nicholas and Edward Doubet.

JUDSON STARR, for appellee Peter Doubet.

MR. JUSTICE DIBELL delivered the opinion of the court.

Joseph Doubet, senior, died intestate in Peoria county on December 19, 1909, leaving surviving him four sons, Joseph, Peter, Nicholas and Edward, and five daughters, and the children of a deceased son and of a deceased daughter, as his heirs at law, and seized of numerous tracts of real estate and of a large amount of personal property. On January 7, 1910, Nicholas and his wife filed a bill for partition of said real estate against the other heirs at law. This is the partition suit referred to in our opinion in *Falor v. Doubet,* 164 Ill. App. 433. The land has been sold, and every question but one has been disposed of. Nicholas, Peter and Edward each occupied portions of this real estate for the year beginning March 1, 1910, and ending March 1, 1911, and the disputed question is how much shall be charged against each of them for the use and occupation of said respective tracts for that period. Some of this land is fine, tillable land, some is fair, some is hilly, some is brush or timber and pasture land and not tillable. The other heirs claim said occupants should pay the fair, cash rental value of the premises, which was variously estimated at from $2 to $2.50 per acre for the poorer pieces and from $5 to $7 for the better land per acre. The three occupants claim under oral contracts for that year, made with their father in the late summer or early fall of 1909.

These and several other matters were referred to the master to take and report the proofs and to report his conclusions and he did so and reported in favor of Nicholas, Peter and Edward, and the court overruled exceptions to that report, and entered a decree on this subject pursuant to said report. One son and one daughter appeal therefrom. They claim that the evidence by which these oral contracts were established was not competent and that the oral contracts alleged are void.

Nicholas established the oral contract between his father and himself by the testimony of Peter and Edward. Peter established his contract with his father by the testimony of Nicholas and Edward. Edward established his contract for that year by the testimony of Nicholas and Peter. The original arrangements between the father, Joseph Doubet, senior, and his sons, Nicholas, Edward and Henry, had been made about fourteen years before March 1, 1911, the termination of the annual tenancies now in question. There had been some changes as to lands two years later, and some slight changes afterwards as to lands, and in 1905 Henry had died and Peter had stepped into his place. The original tenancy and some of the changes and the change in 1905 were proved before the master by at least two witnesses without any objection being made as to the competency of such witnesses to testify to those arrangements, and there is probably enough testimony in the record to which no objection was made to show that in August and September, 1909, Joseph Doubet, senior, renewed the same arrangements with Nicholas, Peter and Edward for the year 1910. But each of these parties called his two brothers to prove specifically what his arrangement with his father was in August and September, 1909, for the year 1910, and when all the oral testimony is read in the record rather than the abstract, it will be found that the details of said arrangements were fully proved if each of said brothers was competent to tes-

tify for the other two brothers. Apparently, each in so testifying was testifying against his own interest, for each of these brothers was entitled to one-eleventh of what should be charged against his brother, and appellants contend that the bargain each made with his father in the fall of 1909 was less than the fair, cash market value of the premises for the year 1910, and therefore each would gain if his two brothers were required to pay the fair, cash rental value of the premises for the year 1910. The real and not apparent interest of a witness is the test by which to determine whether he is testifying against his interest or not. Appellants contend that there must have been some arrangement by which they would testify for each other, and that each obtains a lower rental by reason of the testimony of his brothers, and therefore in fact each testified for his own interest, because he thereby procured the testimony of his brothers in his own behalf. There is force in this position, although, as we shall see later, it cannot readily be determined whether the net result of their bargain with their father was less than the cash rental value of the premises. But it is not so clear that each brother would not have been competent to testify on these subjects for himself, as well as for his brother. *Pigg v. Carroll*, 89 Ill. 205, was, like this, a bill for partition between heirs at law of one who died intestate. Advancements had been made by the intestate to his sons and daughters and the matters in dispute related to the value of such advancements. The Court said:

"The property involved belonged to the litigants, and it makes no difference how they acquire the title to it, whether by purchase or descent. Under our statute, parties are competent witnesses notwithstanding their interest in the property, except where they sue or defend in certain representative capacities. There is, however, no more reason for saying the parties in this case sue or defend as heirs than if the property had been acquired otherwise than by inheritance, and that clause of the statute which inhibits

parties in interest or of record in such cases from becoming witnesses on their own motion, has no application to the case in hand.''

This decision has been approved and applied in *Mueller v. Rebhan,* 94 Ill. 142; *Laurence v. Laurence,* 164 Ill. 367; *Fleming v. Mills,* 182 Ill. 464; *In re Maher's Estate,* 210 Ill. 160; and *Seaton v. Lee,* 221 Ill. 282, and has been recognized and distinguished in a number of other decisions by our Supreme Court. Several of these were cases in partition. In *Laurence v. Laurence, supra,* the Court said:

''In the case of *Pigg v. Carroll, supra,* there was a controversy among heirs over the distribution of an estate where the value of certain advancements to several children of a deceased person were in dispute; but as said in the opinion in *Comer v. Comer,* 119 Ill. 170, in commenting on the case of *Pigg v. Carroll,* 'the parties litigant held title derived from the same identical source, and the litigation concerned property it was conceded belonged to parties to the suit.' The rule in *Pigg v. Carroll* was further explained in *Mueller v. Rebhan,* 94 Ill. 142, and in *Ebert v. Gerding,* 116 id. 216, where it was said that the statute 'was intended to protect the estates of deceased persons from the assaults of strangers, and relates to proceedings wherein the decision sought by the party testifying would tend to reduce or impair the estate.' The rule to be deduced from these cases is, that where, among those who are conceded to be the heirs, there arises a controversy as to the distributon of the estate among them, they may testify, as such testimony does not tend to reduce or impair the estate among them.''

Here, Joseph Doubet, senior, died intestate. This is partition. The parties are heirs at law of said deceased and the husbands and wives of some of them. The heirship is conceded. No stranger is intervening to obtain any part of the estate. At the time of his death the deceased left in his safe in his bedroom over $75,000 in cash and good certificates of deposit, besides other moneys in banks, and his debts were very small. He left between seven hundred and eight hundred

acres of farm land, which passed to these parties. The only question is whether the heirs at law take these lands subject only to the verbal leases previously running, which were to expire March 1, 1910, or whether they took them subject to verbal leases made in August and September, 1909, for the use of the property by three of the heirs at law for the year beginning March 1, 1910. It would seem that this controversy between the heirs at law as to the rents for the latter year comes within the meaning of the decision in *Pigg v. Carroll, supra,* as applied and explained in said later cases. If so, then the evidence was competent and the oral contracts of leasing are established.

But the conclusion of the court below may be sustained upon another ground. A contract of leasing, void under the statute of frauds, may yet be carried out by the parties in interest and they are then bound thereby. Joseph Doubet, senior, died December 19, 1909. The parties had then substantially completed the obligations of the verbal contract for the year ending March 1, 1910. This suit was begun in January, 1910, and proofs were taken in May, 1910, and the premises were sold at master's sale under a decree in this suit in July, 1910. If the leases now in question were to be treated as void, then they would have been terminated by the sale and approval thereof in July, 1910, and the purchasers at the sale would take the entire property upon its confirmation and the delivery of master's deeds. The decree of sale is not in the record before us, but it is plain from a stipulation made before the master during the hearing in May, 1910, that Nicholas, Peter and Edward were to retain possession of the premises as tenants until March 1, 1911, and the proof shows that they did retain their possession as tenants until the latter date. The law seems to be settled that although an original verbal lease is void under the statute of frauds, yet if the tenant occupies the premises under such lease, such verbal agreement is competent evidence for the pur-

pose of ascertaining the rent to be paid. *Marr v. Ray,* 151 Ill. 340.

Joseph Doubet, senior, was quite old when he died. Nicholas had always lived at home with his father. The wife of Joseph Doubet, senior, died about fifteen years before the death of the latter. It would seem from the evidence that Nicholas married soon after his mother's death and Nicholas and his wife thereafter conducted the home and the father lived with them. Some fourteen years or more before March 1, 1911, Joseph Doubet, senior, called his sons together and told them that he wished to quit farming himself and divide the farming of his lands among his sons, and it was arranged that Nicholas should take one part of the lands, including the home farm, and Henry should take another part and Edward a third part. Peter, by the direction of his father, measured off the lands which each of the three should take. Nicholas was to have one eighty free of any cash rent, and it is at least possible that this was because that was the home where the father still lived. It was arranged that Henry should have one eighty free of any cash rent. Why that arrangement as to Henry was made does not appear. Each son was to pay all the taxes on the land which he farmed, was to pay one dollar per acre rent, except as to said two tracts of eighty acres each, was to keep the fences repaired, was to build new fences as required, was to do all needed general repairs, was to fill up the ditches, was to keep the hedges and orchards trimmed and keep the land free of burdocks and other weeds, was to seed down every meadow which he broke up, was to buy the seed himself and was to put in each field such crop as Joseph Doubet, senior, directed. As before stated, this original agreement was proved by testimony to which no objection was made by any one. It will be seen therefore that this was not an ordinary letting. The father retained supremacy over the land and did not give his sons the ordinary right of a tenant to raise such crops as he

desired. Obviously, the father intended to allow such cropping as in his judgment would best preserve and benefit the fertility of the soil. He required of his sons much more in the way of repairs than an ordinary tenant makes. The sons were really farming under his direction and not as mere ordinary tenants. Two years later, some changes were made in the holdings, particular fields being taken from one son and placed in charge of another, and Peter seems to have obtained some land under this arrangement before 1905. In 1905, Henry died and the father placed in charge of Peter the lands which Henry had theretofore cultivated. There was no dispute as to the amount and dispositions of the lands each had under this verbal arrangement in the years 1909 and 1910. As before stated, there is sufficient testimony, not objected to, to warrant the conclusion that the same arrangement was renewed with each of these three sons, Nicholas, Peter and Edward, in the early fall of 1909 for the year beginning March 1, 1910, and if the testimony objected to is competent, as we hold that it is, the details of those arrangements are shown. Each of these verbal contracts seems to have been made at a different time. They were partly proved by oral statements made by the father. These circumstances seem to distinguish this case from *Linn v. Linn*, 261 Ill. 606.

The remaining question is whether there is sufficient part performance to take these leases out of the statute of frauds. As to verbal contracts for the sale of land, it is well established that taking possession and making lasting and valuable improvements on the faith of the verbal contract will, in equity, take it out of the statute of frauds. *Black v. Hoopeston Gas & Electric Co.*, 250 Ill. 68; *Morrison v. Herrick*, 130 Ill. 631. These principles were applied to leases of real estate which, though in writing, had been made without any written authority from the owner, in *Chicago & N. W. Ry. Co. v. Miller*, 233 Ill. 508. In Taylor's Landlord and Tenant (6th Ed.), sec. 32, it is said that

such a parol lease will be enforced in equity if there has been a substantial part performance of it and that possession, delivered under such an agreement, is part performance, especially if the tenant has expended money in improving the property. This general subject is discussed in 1 Tiffany's Landlord and Tenant, pp. 257-264. In *O'Connor v. Enos*, 56 Wash. 448, an oral lease had been made in May, 1904, by which one Oliver was to have the possession of and the right to farm certain lands for the farming season of 1905 for a certain rental, and Oliver afterwards sublet part of said land for said crop year of 1905 to one Elliott, and thereafter pursuant to said agreement, Oliver and Elliott, in the summer of 1904, entered upon some four hundred acres of said land and plowed the same and put the land in condition to be seeded to wheat, and when the lessors sought to repudiate this agreement said four hundred acres had been summer fallowed and were ready to be seeded to wheat in the spring of 1905. It was held that the lease, standing alone, was void by reason of the statute of frauds, but that the acts of the tenants in taking possession under their oral lease and plowing, cultivating and summer fallowing the land before the landlords repudiated the verbal lease, which was in December, 1904, constituted part performance and took the oral lease out of the statute, and that this became a valid, subsisting lease of the premises. In the case now before us, each of these three tenants, in reliance upon his oral lease, made in August or September, 1909, plowed a part of his land in preparation for 1910. Peter had sublet portions of his land to his two sons and they had plowed and sowed wheat upon their portions. Nicholas had sublet portions of his land to a son and to a neighbor and they had plowed part of the land. On at least two of these farms wheat had been sowed in October or November and in the lifetime of Joseph Doubet, senior. Moreover, inasmuch as Joseph Doubet, senior, had retained the authority to direct the particular kind of

a crop that should be planted, it is fair to assume that this plowing and this seeding was done under his direction or with his express or implied approval. These sons did not take possession in the strict sense of the word under the verbal lease for the ensuing year, because they were already in possession as tenants for the year 1909; yet it is obvious that the crop for 1909 had been severed from these lands which were plowed, so that each tenant was practically done with the valuable use of these lands for the year 1909. Under all the circumstances of this case and in view of the fact that the tenants with the express or implied approval of Joseph Doubet, senior, had sublet various parts of these lands and thereby bound themselves in contractual relations with the subtenants, and in view of the control over the crops by Joseph Doubet, senior, we conclude that there was such part performance that Joseph Doubet, senior, could not afterwards have repudiated the oral leases, and that his heirs at law cannot do so. The determination of what acts shall constitute part performance should be governed to some extent by the character of the verbal contract. More should be required to constitute part performance of a verbal contract to sell and convey lands or to lease them for a long period of years than where the verbal contract is only for a lease for a single year. This decision does no injustice. If the contracts were treated as void and the rights of all the parties in this land as terminated at the sale of July, 1910, the land would have been uncropped for that year and therefore likely to bring a less price, or difficulties would have existed in adjusting the pay for what had been done. It is not likely that a tenant would agree to pay as much for the use of lands where the owner retained the powers over the cropping here reserved to himself by Joseph Doubet, senior. There is no proof that the rights which these tenants acquired by these verbal leases were worth more than what they agreed to pay and to do therefor. If all these considerations are in-

correct, yet even then we fail to see why these sons did not hold over as tenants from year to year, as they had not been notified to quit, and such holding over would be on the same terms.

We approve the decree of the court below, which it is conceded is in exact accordance with the terms of the verbal leasings.

The decree is therefore affirmed.

*Affirmed.*