In re Estate of Newman A. DuMont, Deceased. Loretta DuMont, Executrix of Last Will and Testament of Newman A. DuMont, Deceased, Appellant, v. Jane C. DuMont et al., Appellees.

Gen. No. 39,756.

Opinion
filed January 31, 1938.    Rehearing denied February 14, 1938.

GEORGE E. BILLETT, FRANK J. MAKOVSKY and JOHN V. HANNEY, all of Chicago, for appellant.

FRIEDEMAN, COHN, HOWARD & JONESI, LITSINGER, HEALY, REID & BYE, and HERBERT I. COHEN, all of Chicago, for appellees.

MR. PRESIDING JUSTICE O'CONNOR delivered the opinion of the court.

Newman A. DuMont, who was more than 38 years of age, died testate September 30, 1936, leaving all of his property to his mother, Loretta DuMont, and appointing her executrix. Proof of heirship was made and the will admitted to probate November 5, 1936. Afterward, on March 11, 1937, a petition was filed by Jane C. DuMont, claiming that she was the widow of deceased, and that he left him surviving herself and Joan DuMont, their minor child, about 4½ years of age, as his only heirs at law and next of kin; that she had not been notified of the proceedings in the probate court, and that the heirship, as entered by the probate court, showed the deceased left him surviving as his only heirs at law, his mother, brother and sisters, and the prayer was that the proof of heirship be amended so as to show that deceased's heirs at law were his widow and child. An answer was filed to the petition,

and after a hearing the court found that Joan DuMont was the legitimate daughter of deceased, and "the court further finds that the respondent herein, the executrix, by her counsel have agreed in open court to make no objections to this finding and Order." On the same day another order was entered finding that Jane C. DuMont was the lawful widow of deceased, and that deceased left him surviving as his only heirs at law and next of kin, his widow, Jane C. DuMont, and his child, Joan DuMont. An appeal was taken from these two orders, and others not necessary to mention here, to the circuit court of Cook county, where there was a trial *de novo*, and a finding and judgment that Newman A. DuMont left him surviving as his only heirs at law and next of kin, Jane C. DuMont, his widow, and Joan DuMont, his daughter. Loretta DuMont, individually and as executrix of his last will and testament, prosecutes this appeal.

The undisputed evidence shows that Jane C. Wilson and Newman A. DuMont became acquainted in the fall of 1931, when she was about 23 and he 33 years of age; that he began paying her attention, frequently calling on her at her home where she was living with her parents; that about Christmas they became engaged to be married and he so advised her parents; that about January 8, 1932, he took her to Detroit in his automobile and there visited his sister, Mrs. LaMarr, and her husband, where they stayed over the week-end. On this trip she first became intimate with him and such intimacy continued from that time. Some time after they returned from Detroit Jane's mother noticed that Jane was going to have a baby and said that she and DuMont should get married, but DuMont put it off, claiming he did not have sufficient money. It is also undisputed that on the afternoon of July 28, 1932, DuMont took Jane and drove in his automobile

to Crown Point, Indiana. DuMont was a lawyer and a member of the American Legion, and met Harold S. Barr, also a member of that organization, at Crown Point, and at DuMont's request Barr went with Du-Mont and Jane at about five o'clock to the court house to obtain a marriage license, and there DuMont and Jane Wilson each filled out a written application for a marriage license and subscribed and swore to the same before the clerk of Lake county, circuit court of Indiana, and at that time the clerk issued to them a marriage license to which was attached a ''Certificate of Marriage'' to be filled out by the person performing the ceremony.

Jane testified that upon receiving the license Barr left them and they went across the street to Justice of the Peace Kemp, who married them. (We shall assume for the purpose of this decision that Jane was an incompetent witness and her testimony disregarded.) The undisputed evidence further shows that the two parties returned to Chicago on the evening of July 28, where they stayed together that night in a hotel, and the next day went to the home of Jane's parents where he told her father and mother that he and Jane had been married the evening before at Crown Point. He went to his home and she stayed with her parents; on the next day, July 30, he took her in his automobile and they drove to visit his sister, Mrs. LaMarr, who had moved from Detroit to New York City, where they stayed for a few days, when he returned to Chicago. Jane continued to stay with his married sister and her husband in New York, where arrangements were made for Jane to be later taken to a hospital during her confinement. The baby was born October 7th, and after the usual time Jane and the baby returned to the La-Marrs, with whom they lived until about Thanksgiving, when she went with the baby to stay with relatives

at Westfield, N. J. About this time DuMont made arrangements for Jane and the baby to return to Chicago and December 4 they were met at the railroad station in Chicago by Jane's mother and sister and DuMont; he took the baby and Jane and drove them to the Chicago Nursery and Half Orphan Asylum on the north side of Chicago, where the baby was left until June 17, 1933, when she was taken by DuMont to his mother's home. After the baby was put in the Nursery DuMont returned to his mother's home where he continued to live, and Jane went to live with her parents.

The evidence further shows that DuMont's mother and Jane's mother were very friendly and visited back and forth, and that Jane often called to see the baby at Mrs. DuMont's home, but that DuMont and Jane did not live together.

Mrs. Braddock, a social worker connected with the Half Orphan Asylum to which the baby was taken upon return to Chicago, testified that shortly before December 4th DuMont called at her office and arranged to have his infant daughter placed in the institution, stating that the mother and daughter were coming from New York; that, ''He was unable financially to establish a home for them at that time and there was a very sick boy in the home of his wife. She was going on home''; that he wanted us to take the child for at least three months, and said he and his wife would bring the child to the institution; that the baby was brought to the institution and she saw DuMont about three months afterward, and ''I asked him if he had considered the people involved in this triangle as it were. I asked him if he was married and he said, 'Yes, we were married in Crown Point and it is on the record in Crown Point, and I am going to get a divorce and have it on record in Chicago' ''; that he also said he had not told his mother they were married, and

further that he did not love Jane and had no intention of ever living with her.

Barr testified that he first met DuMont and Jane on the evening of July 28th at Crown Point, Indiana; that they talked on the lawn for some time before he went with them to get the marriage license; that DuMont told him they wanted to get a marriage license and wanted no publicity; that they only wanted the license but did not want to get married; that the girl was pregnant and that she did not care to get married; and that he said he would help them get the license without publicity.

There is other evidence in the record, some witnesses testifying that DuMont told them he was married and had a child, while other witnesses gave testimony to the effect that DuMont had said he was a bachelor and was never married; but we think it unnecessary to discuss the evidence further.

The Judge, who saw and heard the witnesses testify, found that under the Indiana law the marriage was valid and the child legitimate, and it appears that he gave little or no credence to the witness Barr. On this matter, the court said, among other things, "I somewhat doubt his (Barr's) story that they told him they wanted to fool the parents. That doesn't seem like a story you would tell to an utter stranger. . . . I cannot say that I put such a reliance on his testimony as would illegitimize this child." The court further stated that a section of the Indiana statute was introduced in evidence which provides: "When Marriage Valid.—No marriage shall be void or voidable for the want of license or other formality required by law, if either of the parties thereto believed it to be a legal marriage at the time." 8 Burns Ind. Stat. Ann. 1933, ch. 3, p. 489. We think the finding of the trial Judge was the only one justified by the evidence without considering the testimony of Jane, which, as we have

above stated, was inadmissible. *Laurence v. Laurence,* 164 Ill. 367; *Estate of Maher,* 210 Ill. 160; *In re Petition of Saunders,* 245 Ill. App. 423. Under the Indiana statute above quoted, we think the marriage was not void or voidable because we think the evidence shows each of the parties believed the marriage was legal at the time. Jane's mother and father both testified that on July 29th, the day after DuMont and Jane returned from Crown Point, he said they had been married there the day before. He also told Mrs. Braddock he had been married at Crown Point but that he and his wife were separated and that he was contemplating a divorce. We think this was sufficient under the Indiana law to make the marriage valid.

But counsel for Loretta DuMont, deceased's mother, individually and as executrix, say that the court erred in considering the Indiana law as announced by the Supreme Court of that State, because the opinions were not introduced on the trial, citing cases which hold that laws of a foreign State must be offered in evidence in a trial in Illinois or they cannot be considered. The difficulty with this contention is that counsel overlook the fact that the law in this respect was changed in 1929 by our legislature. By that act trial courts and courts of review in this State are required to take judicial notice of "All laws of a public nature enacted by any state or territory of the United States." Ill. Rev. Stat. 1937, ch. 51, §§ 48a and 48b, pp. 1633, 1634; Jones Ill. Stats. Ann. 107.122, 107.123; *Christensen v. Blinstrup,* 284 Ill. App. 163.

In *Teter v. Teter,* 101 Ind. 129, it was said that (p. 133) "the declarations of the parties that they were married, the acknowledgment of the appellee as the child of the marriage bed, create a presumption of marriage too strong to be overcome by the general statement of the husband, when on the witness stand,

that there was only one marriage. Our conclusion is dictated by sound principles of public policy, and just principles of morality. . . . There was present in the minds of the parties the mutual consent which gives validity to marriages even though there is no formal solemnization. It is not the formal ceremony that creates the marital relation. . . . Persons may be punished for not obtaining licenses to marry or for not taking steps to secure a proper record of the marriage, but there may, nevertheless, be a valid marriage. The want of form, or the lack of ceremonial rites, does not impair a marriage contract, in cases where it is entered into from good motives and with an intention to contract a present marriage, and is followed by an open acknowledgment of the marital relation.

"We said when this case was last here, that little, if any, formality was required in the marriage ceremony, and we now say that no formal ceremony is necessary, and that if the motives are good, the intention to effect an immediate marriage is present, and the purpose to unite as husband and wife exists in the minds of both parties, mutual consent is all that is required." And continuing the court said (pp. 135, 136): "This general doctrine extends so far as to sustain the validity of marriages made without complying with forms prescribed by statute, for it is held that such marriages will be sustained unless the statute expressly declares them void. . . . If this be the rule where the common law doctrine prevails, there can be no doubt that it is the rule under a liberal statute like ours, which declares marriage to be a civil contract. The conclusion from these authorities is that the question whether there was or was not a marriage depends entirely upon the motives, intention and agreement of the parties, and not upon any mere matters of form or ceremony."

In *Lowrance v. Lowrance,* 95 Ind. App. 345 (182 N. E. 273), the court held that under the Indiana statute above quoted, the court would not void a marriage because of the absence of legal formalities.

The judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

McSURELY and MATCHETT, JJ., concur.