(No. 17762.

CASSIE BOGART *et al.* Appellees, *vs.* CLEMENTINE ORPHELIA BRAZEE *et al.* Appellants.

*Opinion filed June 23, 1928—Rehearing denied October 3, 1928.*

Lawrénce Y. Sherman, and Noah C. Bainum, for appellants.

Campbell & Fischer, Castle, Williams, Long & Castle, Leo J. Kramer, Frank W. Swett, and Carlton L. Fischer, for appellees.

Mr. Commissioner Partlow reported this opinion:

Appellee Cassie Bogart filed her bill for partition in the circuit court of Cook county, in which she alleged that Edwin B. Jennings died intestate in Cook county on October 31, 1923, seized of certain real estate; that complainant, George T. Jennings, Edna E. Quest, Florence E. Brady, Charles R. Jennings, John A. Jennings, Jr., Norman C. Brizse and Sarah M. O'Carr, the last seven of whom were defendants to the bill and are appellees here, by the death of Edwin B. Jennings became seized in equal parts, as tenants in common, of the real estate described in the bill. The bill also alleged that Benjamin F. Brazee, Elizabeth B. Campau, Ida E. Ure, Edwin L. Breezee, and several others, including the unknown heirs of Edwin B. Jennings, claim some interest in the real estate but that said defendants were not heirs of Jennings. Answers were filed to the bill by some of the defendants. Pending a hearing Benjamin F. Brazee died, and his widow, Clementine O. Brazee, and his daughter, Maud B. Fohrman, were substituted as parties defendant: Elizabeth B. Campau also died, and her husband, Alexander P. Campau, and her children, Della Wo-

dolan, Anna E. Sartwell, Rose M. Salisbury, Frank Coykendall, Milton Coykendall and Fred E. Coykendall, were substituted as parties defendant. Upon a hearing on bill and answers a decree was entered finding that appellees, Cassie Bogart, George T. Jennings, Edna E. Quest, Florence E. Brady, Charles R. Jennings, John A. Jennings, Jr., Norman C. Brizse and Sarah M. O'Carr, were heirs of Edwin B. Jennings and were the equal owners of the real estate as tenants in common and entitled to partition as alleged in the bill. From this decree an appeal has been prosecuted to this court by appellants, who are the heirs of Benjamin F. Brazee and Elizabeth B. Campau, and by Ida E. Ure and Edwin L. Breezee.

The determination of the question as to who are the heirs of Edwin B. Jennings, the intestate, depends on the relationship, if any, which existed between Stephen Brizse, who was the grandfather of Jennings, and Jacob Breezee. Appellants claim that Jacob Breezee was the father of Stephen Brizse; that Stephen Brizse was a brother of John Breezee, who was the father of Benjamin F. Brazee and Elizabeth B. Campau; that Stephen Brizse was also a brother of James Breezee, who was the father of Edwin L. Breezee and Ida E. Ure. If Stephen Brizse was the son of Jacob Breezee, then all of appellants were heirs of Edwin B. Jennings and were entitled to share in his estate. Appellees contend that Jacob Breezee was not the father of Stephen Brizse but that Henri Brizse was the father of Stephen; that John and James Breezee were not the brothers of Stephen, therefore appellants, who were the heirs of John and James Breezee, were not heirs of Stephen and are entitled to no share of the estate, as was found by the decree.

The evidence shows that Edwin B. Jennings, who was a bachelor sixty-four years old, died intestate in Chicago on October 31, 1923. He had three brothers, who had previously died, and none of their direct descendants, if they had any, are parties to this suit or claim any interest in

the estate. The father of Edwin B. Jennings was John D. Jennings, and his mother was Hannah Brizse. The father and mother were married at Lockport, New York, in 1838. John D. Jennings died in Chicago on April 14, 1889, at the age of seventy-three, and Hannah B. Jennings died in Chicago on February 1, 1892. John D. Jennings had a brother, Samuel H. Jennings. Their father was Samuel Jennings and their mother was Betsy D. Jennings. Betsy had a brother, Eli C. Dunham, who was the father of Cassie Bogart, the complainant herein and one of appellees. The father of Eli C. and Betsy D. was Caleb Dunham, who was the great-grandfather of Edwin B. Jennings, the intestate. Samuel H. Jennings, the brother of John D. Jennings, had three children, Charles E., John A. and Samuel H. Jennings, Jr. Charles E. Jennings left three children, Edna E. Quest, Florence E. Brady, and Charles R. Jennings, all of whom are appellees here. John A. Jennings left one son, John A. Jennings, Jr., who is one of appellees. Samuel H. Jennings, Jr., left one son, George T. Jennings, who is also an appellee. The parentage of Edwin B. Jennings was established by the family Bible produced by his sister-in-law, by a printed family genealogy annotated in his handwriting, and it was confirmed by his father's will put in evidence by appellants. His grandmother, Betsy D. Jennings, was identified and her parentage established by the family Bibles of her sons John D. and Samuel H. Jennings, produced by a daughter-in-law, containing the following entry: "Samuel Jennings was married April 13, 1814, to Betsy Dunham, of and in the town of Westhaven and State of Vermont, and was the· daughter of Caleb Dunham and Sarah, his wife, and her name was Sarah Tombling before her marriage." The relationship of Caleb Dunham, the father of Betsy D. Jennings, to Cassie Bogart was established by her father's family tree. The Dunham-Jennings relationship was corroborated by a memorandum for a Bible entry dictated to

Mrs. Ruhl by her father, and by the testimony of George E. Pringle, of St. Louis, who had been for many years a close friend of Edwin B. Jennings, and who produced letters in the handwriting of Jennings addressed to Pringle as "Dear Cousin." This evidence accounts for all of the heirs of Jennings on his father's side of the family, five in number, all of whom are appellees. There can be very little, if any, doubt as to the relationship of these five persons to the intestate.

The heirs of Edwin B. Jennings on his mother's side of the family are as follows: The father of his mother, Hannah Brizse, was Stephen Brizse, and her mother was Mary O'Carr. Stephen Brizse and Mary O'Carr were also the father and mother of Eliza Brizse, who is not interested here, and of Peter F. Brizse, a brother of Hannah B. Jennings. Peter F. Brizse had a son, Charles N., who was the father of Norman C. Brizse, one of appellees. The father of Mary O'Carr was Nicholas O'Carr. Mary O'Carr, the mother of Hannah B. Jennings, had a brother, Peter O'Carr, who was the father of Sarah M. O'Carr, another appellee. The identity of Hannah B. Jennings was established by the family Bible, by the genealogy mentioned above, and by the December 5, 1838, issue of the *Niagara Democrat and Lockport Balance,* which contained a notice of the marriage of John D. Jennings and Hannah Brizse, eldest daughter of S. Brizse. It was confirmed by the will of John D. Jennings, which also established the relationship of Eliza Brizse, his wife's sister, and provided a legacy for his wife's nephew, Charles N. Brizse, then of New York City, who formerly lived in Lockport, New York, and who was the father of Norman C. Brizse, one of appellees. Stephen Brizse was identified as the father of these two sisters and brother by inscriptions on tombstones in the family lot at Lockport, and by a memorandum in the handwriting of Eliza Brizse, produced by the daughter of Elbridge Dakin, the husband of Mary B. Dakin, who was a daughter of

Stephen Brizse, the memorandum having been kept in the family Bible. The identity of Mary O'Carr Brizse as the wife of Stephen Brizse and as the daughter of Nicholas O'Carr and sister of Peter O'Carr was shown by the will of Mary O'Carr Mumford, the mother of Mary O'Carr Brizse and Peter O'Carr, and by the will of George Mumford, the second husband of Mary O'Carr Mumford. Mrs. Henson, of Chicago, who was a grand-daughter of Peter O'Carr, testified to having visited in Simcoe, Ontario, Canada, over forty years prior, and to her acquaintance there with the family of Peter O'Carr, including his daughter Sarah M. O'Carr. She also testified to family visits in Chicago between Sarah M. O'Carr and Hannah B. Jennings and Eliza Brizse. She was also acquainted with the intestate, who had visited at her home. The record also shows acquaintance, communications and visits between the families of Cassie Bogart, Sarah M. O'Carr and Edwin B. Jennings. This evidence establishes the heirs of Edwin B. Jennings on his mother's side, making eight in number on both sides, and they are entitled to the entire estate provided Stephen Brizse, the father of Hannah B. Jennings, was not the son of Jacob Breezee.

The next question is whether Stephen Brizse was the son of Jacob Breezee, as claimed by appellants, so as to entitle them to share in the estate. It is to be noted that there are various spellings of the family name of Jacob Breezee. By some members of the family it is spelled Brazee, by others Brisee, by still others Breezee. All of these spellings, however, are limited to the family and the descendants of Jacob Breezee. Most of the members of this family spelled the name Breezee, except Benjamin F. and his sister, who spelled it Brazee. There are some instances in which the Brizse family name is otherwise spelled, but in the main it is spelled Brizse. Stephen Brizse was born in Massachusetts about 1789, and died in Lockport, New York, about 1861. He was married to Mary O'Carr, who lived

in Simcoe, Ontario, Canada. It is conceded that he had a brother Henry, who was born in Massachusetts and died in Penn Yan, New York, about 1840, at the home of his daughter, Mrs. Norris. The evidence also shows that there was another brother, Norman, who was born in 1795 and died in 1825. Henry and Norman are buried on the same cemetery lot at Geneva, New York, as shown by the photograph of their tombstones offered in evidence. In 1812, and for a few years prior thereto, Stephen, Henry and Norman lived in Geneva. Stephen moved to Lockport about 1830, where he lived until his death. Henry lived in Geneva, except for a short time when he lived in Penn Yan and for a short time in Buffalo. The family tradition of the Brizse family was that the father of Stephen, Henry and Norman was a Frenchman, who came to America as a soldier under Lafayette. The family had for three generations an epaulet and a picture of Lafayette which they prized highly. The surviving husband of Henry's grand-daughter, Dr. Ira C. Brown, who was the health officer of the Seattle schools, testified that his mother-in-law, Rose B. Norris, who was a daughter of Henry Brizse, told him that the father of these three brothers was Henry Brizse. The other living members of the Brizse family could not give the first name of their ancestor. Mrs. Howes, a niece of Dr. Brown's wife, testified that her grandmother, Mrs. Norris, told her that her great grandfather was Jacob Breezee.

At the time Stephen, Henry and Norman Brizse were living in Geneva, Jacob Breezee was living at Pillar Point, in the town of Brownsville, Jefferson county, New York, and he continued to live there and at Dexter or Sacketts Harbor until he died, about 1860. Sacketts Harbor is about 125 miles from Geneva. There is considerable conflict in the evidence as to the nationality of Jacob. Six witnesses testified that he was a Frenchman and five testified that he was Dutch. It is certain that his family did not come directly from France to America. There is evidence that

his family went from France to Holland; that his mother was a Gardner, and that the Breezee and Gardner families came from Holland to America. There is considerable conflict in the evidence as to the year of Jacob's birth. Appellants contend that he was about twenty-nine years old when Stephen Brizse was born, in 1789, while appellees contend that he was only twelve or thirteen years old when Stephen was born, and that this conclusively shows that he was not the father of Stephen. · Appellants contend that Jacob was one hundred years old at the time of his death, while appellees contend that he was about eighty-five years old at the time of his death. A United States census report offered in evidence, taken July 18, 1850, in Brownsville, New York, where he lived at that time, gave the age of Jacob as seventy-three and shows that he was born in the State of New York. A New York census report taken in 1855 gave his age as seventy-seven years, that he was born in Livingston county, New York, and had resided for forty-one years in the town where he resided in 1855. A United States census report taken June 18, 1860, gave his age as eighty-four years and his place of birth as New York. Appellants offered a census report of 1830 which they contend shows that his age at that time was between sixty and seventy. A photograph of this report of 1830 appears in the record. The age is indicated by a mark or dash between the years sixty and seventy. There is no positive statement as to his exact age in the report and it is of very little value in determining his age. There are no lines, spacings or markings of the several columns on this report where the age is to be indicated. By misplacing the mark or dash less than one-eighth of an inch the age might be overstated or understated as many as nineteen years. In fact, if the mark or dash in this report were moved less than one-eighth of an inch to the left it would be directly under the column indicating over fifty and under sixty years of age, and would thereby corroborate the three cen-

sus reports offered by appellees. All of the reports except the one for 1830 gave the name of Jacob's wife as Mary, which was the name of his last wife. If Jacob was seventy-three years old on July 18, 1850, he was born in 1777, which would make him only twelve years older than Stephen, his alleged son, who was born in 1789. If Jacob was seventy-seven years old in 1855 he was born in 1778 and was only eleven years older than Stephen. If he was eighty-four years old in 1860 he was born in 1776 and was thirteen years older than Stephen. If these census reports are correct, Jacob was born about 1776 or 1778, he was eleven to thirteen years old when Stephen was born, he was about eighty-five years old when he died, and he could not have been the father of Stephen.

Considerable light is thrown upon the questions at issue when we consider how many times and when Jacob Breezee.was married and how many children he had and when they were born. Evidence was offered by appellants tending to show that he was married three times; that the name of his first wife was Hannah, his second wife was Margaret Hoffman and his third wife was Mary Carpenter; that he had fourteen children, including Stephen and Henry Brizse. The evidence on behalf of appellees is that he only had two wives, Margaret and Mary; that he had no children by Mary and that Margaret was the mother of all of his children, three of whom died in infancy and four boys and four girls reached maturity. There is very little reliable evidence to show a marriage with Hannah, or if there was such a marriage, that any children were born of that marriage. Appellants admit that eleven children were born to Jacob and Margaret, including James Breezee, the father of some of appellants, but not including John Breezee, who is the father of other appellants, or Norman, Stephen and Henry Brizse. They also admit that no children were born to Jacob and Mary. Under this admission, if Stephen, Henry and Norman were sons of Jacob, their

mother, of necessity, must have been Hannah, the first wife. A tombstone at the grave of James Breezee, who was the youngest son of Jacob and Margaret, shows that he died January 4, 1893, aged sixty-six years, therefore he was born in 1827. Stephen Brizse was born in 1789. James Breezee and Stephen Brizse are referred to in the evidence as brothers. They are not referred to as half-brothers. There was thirty-eight years' difference in their ages, which would raise some doubt that they had the same mother. If John Breezee was born in 1793, as his son Benjamin testified, and James was born in 1827, it is also doubtful whether James and John were more than half-brothers, although they also are referred to throughout the record as brothers. Hattie K. Manchester, a member of the Breezee family, gave the names of the eleven children of Jacob and Margaret and the order of their birth, but Stephen, Henry and Norman were not included in this list. The first child was a girl, born in 1802. The list of children included John as the fourth child, which would make the date of his birth about 1810. If John was born about 1810 then Margaret was his mother. John lived in Jefferson county, New York, until 1844, when he moved with his family to Oswego, in an adjoining county, where he resided until his death, in 1850. His widow, Rebecca, continued to live at Oswego and vicinity until 1855, when she moved to Dexter, near Pillar Point and Sacketts Harbor. She resided there some time and then moved to Starkey, which was near Penn Yan, New York, where her daughter Elizabeth B. Campau was married in 1866. Rebecca lived at Starkey a few years and married a man by the name of Smith, and she died in Detroit on June 24, 1899, aged eighty-six, as shown by her death certificate offered in evidence. Appellants claim that John and Rebecca were married in 1817 and that several children were born to them. Appellees claim that either some of the children named by appellants are mythical or that the dates of their births are stated at least ten years

earlier than the true dates. Appellees insist that no claim was made of the marriage of Jacob prior to his marriage with Margaret until after the evidence was introduced as to the inscriptions on the tombstone of James Breezee, which showed that he was born in 1827; that immediately on the production of this evidence appellants produced evidence to show a prior marriage of Jacob with Hannah; that this was done to cover the wide range in dates between the birth of Stephen Brizse and James Breezee. The evidence with reference to the age of Jacob, his various marriages and the number and dates of the births of his various children, very strongly tended to show that Stephen Brizse was not the brother of James and John Breezee and that he was not the son of Jacob Breezee.

Benjamin F. Brazee testified that he has lived in Chicago since 1901; that he did not know Edwin B. Jennings in his lifetime; that he never knew the names of the children of Stephen Brizse until six or seven months before he testified on September 30, 1924; that he first heard of the Jennings family about six months before he testified. In the face of all these facts, however, he testified that Stephen was his father's brother, and that when Benjamin was about ten years old he saw and knew Stephen; that Stephen visited his father, Jacob, at Sacketts Harbor, and he (Benjamin) slept with Stephen one night. He testified in great detail as to Stephen's family and their relations with his own, even to a conference held in 1854 or 1855 with reference to changing the spelling of the Breezee family name, at which conference he said Stephen was present. Elizabeth Campau testified that she knew Hannah Brizse and Hannah's mother, Mary; that Mary, the wife of Stephen, was a great friend and chum of Rebecca, Mrs. Campau's mother; that Mary and Rebecca had worked together at Oswego; that Mary and her daughter Hannah visited Rebecca at Oswego when the witness was eight years old, and that Hannah was then about eighteen years old. On the other hand, the evi-

dence shows that Mrs. Campau was eight years old in 1856, and at that time Hannah, the daughter of Stephen, had been married to John D. Jennings for eighteen years and was living in Chicago, and that Mary O'Carr Brizse, the mother of Hannah, was seventeen years older than Rebecca, the mother of Mrs. Campau. Mrs. Campau further testified that she knew her uncle Henry and knew Stephen when she was nine years old; that Stephen was then living in Geneva, and when she was young her uncle Henry was working in the shipyards at Oswego; that Stephen was a tall man; that her father and all of Jacob Breezee's children were born in Massachusetts, and that her mother knew Mary O'Carr, the wife of Stephen, before Stephen and Mary were married. On the other hand, the evidence shows that Jacob Breezee and all of his children were born in the State of New York; that Stephen was living in Lockport in 1857, when Mrs. Campau was nine years old; that Stephen was not a tall man, as testified by Mrs. Campau, but that he was a short, stout man.

Appellants offered evidence tending to show that Jacob Breezee was a Revolutionary soldier and that he served in the war of 1812. The evidence sustains the contention that he served in the war of 1812 but it does not sustain the contention that he was a Revolutionary soldier. If the evidence offered by appellees as to his age is to be believed, he was too young to have served in the Revolution. No documentary evidence as to any such service was offered, but the evidence offered consisted of statements not based on facts of which the witnesses had any personal knowledge. Evidence was offered to show that some of Jacob's descendants were eligible to membership in the Daughters of the American Revolution, but other evidence tended to show that they were eligible through members of their family other than Jacob. The only importance of this evidence was to establish the age of Jacob, but it was of very little value for that purpose.

Various members of the Brizse and Breezee families lived in different places in the State of New York for many years within 125 miles of each other, and some of them lived in Chicago for many years, and yet there is very little reliable evidence that one family knew of the existence of the other or that they were related. Josephine Howes was the only member of the Brizse family who testified that they ever heard of any member of the Breezee family. She did not claim that she ever knew or had any communication with any member of the Breezee family. She testified that her grandmother, Rose Norris, visited the Brizse family at Lockport and Oswego, but she could not name any relations, outside of Stephen and Henry Brizse, who were visited. She testified that her grandmother told her that her father, Henry Brizse, had a half sister, Susan, living at Sacketts Harbor. She was the only witness who testified to any half-blood relationship in the Brizse family. She testified that Edwin B. Jennings told her in 1892 that he was going to Watertown to visit Warren Breezee.

The only witnesses belonging to the Breezee family who testified to any acquaintance or connection with any member of the Brizse family are Benjamin F. Brazee, Elizabeth Campau, Maud Fohrman and three Watertown witnesses, James Breezee, Charles Breezee and Almira Sprague, nieces and nephews of claimants. One illustration will be sufficient to show the character of this evidence. On March 20, 1925, James W. Breezee, of Watertown, made an affidavit to the effect that he was a grandson of James Breezee, who was a son of Jacob Breezee; that Jacob also had a son Stephen, who lived at Lockport, New York. This affidavit was made in support of a claim of heirship by the affiant and his brother, Charles C. Breezee, and his sister, Almira Sprague. This affidavit was used in the hearing on the question of heirship in the probate court of Cook county within a few weeks after the affidavit had been filed. After the cousins of this affiant's father had been unsuccessful in

their claim of heirship in the probate court and an appeal had been taken to the circuit court of Cook county, the depositions of James W. Breezee and his brother and sister were taken at Watertown for use in the circuit court on the hearing of the appeal from the probate court. The substance of these depositions is, that in the spring of 1907 (the time being fixed definitely as prior to the death of their father, who died in June, 1907, and not earlier than April,) a gentleman appeared at their hcme in Watertown and joined the family at the table. Almira Sprague asked her father who the man was, and the visitor responded for the father that he was her cousin, Edwin B. Jennings. The visitor is alleged to have stayed at their home for a week. The three witnesses testified that they never mentioned this visit until after the hearing in the probate court, although they had retained an attorney to represent them at that hearing and had repeatedly consulted with him, and had caused an affidavit to be filed some weeks prior to the hearing in which they asserted their claim of heirship. At the time of this alleged visit Edwin L. Breezee was living within a few miles of Watertown but Edwin B. Jennings did not call on him. James Breezee in his deposition alleged that the man who visited his father was looking up his relatives. To refute this evidence, checks of Edwin B. Jennings were offered in evidence drawn upon a Chicago bank, covering the month of April, 1907, which checks went through the clearing house in Chicago within one or two days after they were drawn. These checks showed that Jennings was not out of Chicago for one week at the time specified in the depositions. Other evidence was offered from business associates which corroborated the showing made by the checks. It will not be necessary to go into detail as to this matter, but in our judgment this evidence refutes the allegations in the depositions that Jennings visited in New York in April, 1907.

Several members of the Brizse family living in New York testified to a visit which Edwin B. Jennings made them in 1892, soon after his mother's death. The places visited were Buffalo, Geneva, Tonawanda and New York City. The evidence shows that in each of these places he had relatives on his mother's side. Josephine Howes testified that on this occasion Jennings told her that he was going to Lockport, Geneva, Oswego and Watertown to visit relatives, and that within a week or ten days he returned and told her he had visited these places. She testified that for a year after that visit she corresponded with him at 2406 Prairie avenue, Chicago. Evidence was offered by appellees that Jennings did not live at that address until seven years later and that he had no relatives in Lockport in 1892. There is no convincing evidence that Jennings visited any members of the Breezee family on this occasion, although several of them lived in towns near where he did visit. If Mrs. Howes on this occasion knew that Jacob Breezee was the father of Stephen Brizse and that the descendants of Jacob lived in the vicinity, it is strange that she did not inform Jennings of that fact so he could visit that branch of the family.

Many other facts might be cited which corroborate the evidence offered by appellees, including the fact that the members of the family of Jacob Breezee were Baptists while the members of the family of Stephen Brizse were Universalists; that the family of Margaret Hoffman, one of the wives of Jacob, was wealthy, and there was a controversy with reference to the heirship of the property; that members of the Breezee family claimed part of it, but the Brizse family knew nothing about it. The evidence offered by appellees to establish that they were the heirs of Edwin B. Jennings was positive and affirmative in character. It consisted of the evidence of witnesses who personally knew the relationship between some of appellees and the intestate, of family records contained in family Bibles,

of family trees of undisputed origin, of statements in deeds, wills and on tombstones, of newspaper clippings, pictures, subscription lists and war records. In fact, there is very little contention that appellees are not heirs of the intestate, and, even if it were so contended, such a contention could not prevail in the light of the whole evidence. On the other hand, the evidence as to the relationship of appellants to the intestate is very uncertain. The main issue was not the relationship of the various members of the Breezee family to each other, but the vital question, and the question upon which the issues in this case must turn, was the relationship, if any, between Stephen Brizse and Jacob Breezee. Mrs. Howes testified that she was told that Jacob was Stephen's father. The weight to be given to her evidence is extremely doubtful. It appears that she was a very friendly and willing witness. She was flatly contradicted in several material respects, and on other points evidence was offered to show that she was either mistaken or that she did not testify truthfully. Except as already stated, no witness was produced who knew of his own knowledge of any relationship between Jacob and Stephen. No family records, deeds, wills or inscriptions on monuments were produced showing such relationship. The evidence is in sharp conflict even as to the nationality of Jacob, as to when he was born, how many times and to whom and when he was married, how many children he had, the order of their births, and their ages. The chancellor saw some of the most important witnesses and heard them testify, and he was in a better position than we are to determine the credit to be given to their evidence. We are convinced that the chancellor was not in error in entering the decree finding that appellees were the heirs of Edwin B. Jennings.

Appellants insist that the administrators of the estate of Edwin B. Jennings were not proper or necessary parties defendant, for the reason that the personal estate was sufficient to pay the debts. The bill alleged that the time for

filing claims had expired and that the administrators had assets in their hands sufficient to pay all debts filed or which might thereafter be allowed. This allegation did not establish that the personal estate was sufficient to pay the debts. Even if evidence had been introduced tending to establish that fact, a finding based thereon would not have been binding upon the administrators if they were not parties to the suit. Administrators are proper parties, even if they are not necessary parties to a bill for partition, where the administration has not been completed in the probate court. (*Ellis* v. *Dumond*, 259 Ill. 483; *Watke* v. *Stine*, 214 id. 563; *Hall* v. *Gabbert*, 213 id. 208; *Wachter* v. *Doerr*, 210 id. 242.) Counsel cite no authority which would justify a reversal of the decree even if the administrators were not proper parties defendant, where no injury was occasioned. Appellants did not claim that there were any improper parties until the cause was being heard, and even then they did not move to dismiss the administrators. They merely made an objection to the personnel of the solicitors for the administrators. Appellants were not injured because the administrators were parties defendant.

Complaint is made that certain solicitors who appeared for some of the appellees also represented the administrators. There was no conflict in the evidence between appellants and the administrators, who were only nominal parties. The administrators were in no way interested in the final distribution of the estate. There is no evidence that they took any part in establishing the heirship. Appellants have recognized that the administrators were only nominal parties by filing an appeal bond running to the eight appellees and making no mention of the administrators as parties defendant.

Complaint is made that Arista B. Williams, who was the solicitor for some of the appellees, and Edgar D. Mohan, who was the solicitor for the administrators, testi-

fied as witnesses without first withdrawing from the case. After the death of Jennings a table of heirship was established in the probate court of Cook county in December, 1923, upon the testimony of Williams, an attorney for four of the parties and for the administrators. The table of heirship thus established included all of appellees except Cassie Bogart. Later, Benjamin F. Brazee, Elizabeth B. Campau, Edwin L. Breezee and Ida E. Ure filed their petition in the probate court asking that the table of heirship as established be amended and that they be included as heirs. The matter was heard by the probate court, and there was a finding that appellees were the heirs of Jennings and that Benjamin F. Brazee, Elizabeth B. Campau, Edwin L. Breezee and Ida E. Ure were not heirs. There was an appeal from that finding to the circuit court. On the trial of this case the depositions and evidence offered in the probate court were admitted without objection by appellants. Under this state of the record no just complaint can be made by appellants that the evidence of Williams given in the probate court is a part of this record or that his testimony should require his withdrawing from this case. On the trial of this case Williams merely identified two photographs of monuments on the Brizse family lot in Lockport, New York. Mohan had been the confidential attorney of Jennings since 1902 and had kept his books since 1894. During 1896 and 1897 he and Jennings lived together. Upon the death of Jennings the administrators employed Mohan as their attorney, and for his services he had received from $10,000 to $15,000. He was an attorney of record for the administrators in this and other proceedings and had been present during a large part of the trial of this case. He was called as a witness and testified at considerable length as to the whereabouts of Jennings during the month of April, 1907, when it was claimed that Jennings had paid a visit to his relatives at Watertown. He knew of the business transactions in which Jennings

was interested, of his personal habits, his business methods, his associates, his signature, and he was familiar with the books and checks covering the time Jennings was alleged to have been at Watertown. Writings, contracts and checks covering the period of time Jennings was claimed to have been in Watertown were identified by Mohan, and some of them were admitted in evidence. It is claimed that Mohan had no personal knowledge with reference to these transactions and therefore his evidence was not admissible. The question raised does not go to the admissibility of his evidence, but the complaint is that he testified as a witness without withdrawing as a solicitor in the case. The record shows that before he went on the witness stand he withdrew from the case, and there is no evidence that he took any active part in further proceedings although his name appears in the decree as a solicitor. His evidence was corroborated in many respects by other competent testimony. The record does not sustain the contention that Mohan testified without first withdrawing from the case, therefore the only complaint that can be made of either of the attorneys is that Williams identified the pictures of the monuments. The propriety of attorneys testifying in cases in which they are interested has been criticised by this court, but the objection goes only to the credibility of such testimony and not to its admissibility. *Eshelman v. Rawalt,* 298 Ill. 192; *Barto v. Kellogg,* 289 id. 528; *Bishop v. Hilliard,* 227 id. 382.

The chancellor sustained an objection to the depositions of Edwin L. Breezee and Ida E. Ure, both of whom claimed to be heirs. This ruling is assigned as error, and it is urged that under section 2 of the Evidence statute they were competent witnesses. The record shows that the court ruled that these depositions were not admissible except in so far as they might relate to matters which transpired since the death of Jennings, or to other matters coming within the express exceptions in section 2 of the Evidence act. He

also suggested that if counsel considered that any of this testimony came within these exceptions they might call it to the attention of the court, but counsel stood on the claim that these two parties were competent witnesses for all purposes and the court ruled they were not. In *Laurence* v. *Laurence,* 164 Ill. 367, which was a partition suit, appellee claimed to be the widow and appellants claimed to be the heirs of Henry Laurence, who had died intestate. The issue was whether appellee was, in fact, the widow and entitled to a share of the estate. The court permitted her to testify, and the decree was reversed. The court discussed the rule announced in *Pigg* v. *Carroll,* 89 Ill. 205, and *Mueller* v. *Rebhan,* 94 id. 142, which are two of the cases relied on by appellants in their brief. On page 373 it was said: "The rule to be deduced from these cases is, that where, among those who are conceded to be the heirs, there arises a controversy as to the distribution of the estate among them they may testify, as such testimony does not tend to reduce or impair the estate among them. Appellee was not an heir until she established the marriage which she alleged and which was denied by the heirs, and until such marriage was established by proof, or conceded, she was a stranger to the estate and incompetent to testify, and the court erred in permitting her to do so over appellants' objection."

In *In re Estate of Maher,* 210 Ill. 160, it was held that a woman claiming to be the lawful widow of the intestate, whose claim in that regard was denied by others who had interests or asserted interests as heirs in his estate, was not competent to testify to the fact of her marriage in a proceeding in which she sought, as distributee, a portion or all of his personal estate, until her status as such widow had been conceded or had been established by the adjudication of a court having jurisdiction of the subject.

In *Crumley* v. *Worden,* 201 Ill. 105, appellant filed a bill to partition the real estate of John J. Worden, in whose

family she had been reared. Appellee, an acknowledged daughter of Worden, claimed that appellant had been taken as a child into the Worden family but had never been adopted. It was held that there was no error in excluding appellant's testimony. On page 114 this court said: "So in the case at bar, appellant filed her bill and claimed to be a child and heir of John J. Worden. Appellee answered, denying that she was either a child or an heir of John J. Worden. That was the question before the court. The distribution of the land, and the title to it as intestate estate of John J. Worden, were not the only questions. So long as appellant's relation to the estate as heir was a controverted question she was incompetent as a witness, on her own motion and against the objection of appellee, to testify touching that subject or matters tending to prove or disprove that issue."

In *Mires* v. *Laubenheimer*, 271 Ill. 296, a bill was filed for partition and the assignment of dower by a son of Frank W. Mires against his mother and sister, Pearl Laubenheimer. The sister defended on the ground that the complainant had released to his father his expectancy in his father's estate in consideration of the execution of a deed to him of certain other real estate. The court held that neither the complainant nor his sister was a competent witness. On page 299 this court said: "Neither Ernest C. Mires nor Pearl L. Laubenheimer was a competent witness in the case. Ernest C. Mires was not a competent witness because Pearl L. Laubenheimer was claiming the whole title as the only heir of her father and that Ernest C. Mires was not an heir. A release to the ancestor, by an heir, of his expectancy as heir, operates not as a contract or as a transfer or a conveyance either to the ancestor or to the other heirs but as an extinguishment of his right to take any estate by descent. It obliterates the right to inherit to an extent substantially equivalent to its obliteration by the death of an heir expectant, without issue, before the death

of the ancestor. * * * The controversy in this case was whether Pearl L. Laubenheimer was entitled to the whole estate as the only heir of her father, or whether she and Ernest C. Mires were each entitled to an undivided half as heirs. Pearl L. Laubenheimer was not a competent witness because Ernest C. Mires was claiming an undivided half of the land as heir of his father."

Under the above authorities the court was not in error in excluding the depositions of Edwin L. Breezee and Ida E. Ure, both of whom were claiming as heirs against others who were also claiming as heirs.

Appellants insist that the court was in error in admitting in evidence the United States census reports of 1850 and 1860 and the New York State census reports of 1855. They are in no position to insist upon this alleged error, for the reason that they offered similar evidence in support of their claim of heirship. They offered in evidence eleven census reports, both State and Federal, beginning with 1820 and ending with 1880, showing the census record of Stephen Brizse, Jacob Breezee, Henry Brizzie, Ida Bresee, James Brezee, Cornelius Brizzie and George W. Brusie. Appellants cannot complain of an error which they also committed. *Kuhn v. Eppstein,* 239 Ill. 555.

There are other errors urged which it will be unnecessary to consider in detail.

Appellants were not entitled to any share of this estate, and the decree of the circuit court will be affirmed.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Decree affirmed.*