175 P.2d 692

## SWARINGEN v. SWANSTROM.
### No. 7316.

Supreme Court of Idaho.
Dec. 26, 1946.

Hoyt Ray, of Idaho Falls, and J. L. Eberle, of Boise, for appellant.

W. H. Langroise and W. E. Sullivan, both of Boise, for respondent.

AILSHIE, Chief Justice.

This is an appeal from a judgment of the district court affirming an order of the probate court dismissing appellant's contest of the will of Z. V. Swearingen, deceased. The will was admitted to probate February 27, 1945. Petition for contest was based solely "upon the ground of undue influence by the defendant [respondent herein]". The trial court found that respondent did not unduly influence testator in making a will in his favor.

It follows as a matter of fact and law, that the only issue to be determined on this appeal is whether the evidence is sufficient to support the findings by the trial court. The evidence as disclosed by the record is overwhelmingly in support of the findings of the trial court and clearly demonstrates that no undue influence was exerted by respondent over testator.

The contestant of a will that has been admitted to probate has the burden of showing undue influence. By the weight of authority, that burden never shifts to the proponent of a will. In re Lewis' Estate, 64 Cal.App.2d 480, 149 P.2d 51, 52; In re Southman's Estate, Or., 168 P.2d 572, 581; In re Choiniere's Estate, Mont., 156 P.2d 635, 638; In re Hesse's Estate, Ariz., 157 P.2d 347, 351; 1 Bancroft, Probate Practice, sec. 204, p. 368. In a contest on the ground of undue influence, it must be shown that such undue influence existed and was operating *at the time of the execution of the will*. In re Nielsen's Estate,

198 Wash. 124, 87 P.2d 298, 300; In re Hoscheid's Estate, 78 Wash. 309, 139 P. 61, at page 65; see, also, In re Southman's Estate, supra.

■ The contention, that undue influence was shown by proof that respondent had been the attorney for testator ·for some ten years or more, does not constitute undue influence in itself. No evidence is shown, and there is no evidence, disclosing any pressure or urging by respondent on testator to effect a will in respondent's favor. Indeed, no presumption of undue influence arises on the mere existence of a confidential relation between beneficiary and testator in relationship, or business or professional work, during the lifetime of the testator. Willett v. Hall, 220 Ind. 310, 41 N.E.2d 619, 621; Goodbar v. Lidikey, 136 Ind. 1, 35 N.E. 691, 692, 43 Am.St.Rep. 296; In re Lillie's Estate, 195 Okl. 597, 159 P.2d 542, 545. If the relation of attorney and client or principal and agent existing between the parties is sufficient to constitute undue influence by the attorney or agent over the principal, it would throw open many wills to contest; and, on the contrary, an existence of such a relationship often furnishes potent reasons for the execution of a will in favor of such an attorney or agent. Gwin v. Gwin, 5 Idaho 271, 286, 48 P. 295; Dickey v. Clark, 65 Idaho 247, 257, 142 P.2d 597; In re Turnage's Will, 208 N.C. 130, 179 S. E. 332. Here the evidence is all to the effect that the testator was a very strong-minded (bull-headed) man who insisted on his own way of doing things and was not easily influenced.

■ Error is assigned against the action of the court in permitting Donart to act as attorney and testify in this case, on the ground that it is contrary to the code of legal ethics. Rule 151, Rules of Supreme Court and Board of Commrs. of Idaho State Bar, 62 Idaho p. lxxxl ;[1] Opinion No. 50, Canons of Am. Bar Association (1936 ed.), p. 121 ;[2] Vol. 62, Reports Am. Bar Assn. (1937), sec. 19, p. 1112.[3] The objection is not well founded. It is not

---

[1] (62 Idaho p. lxxxl):
"Rule 151. The Canons of Professional and Judicial Ethics adopted by the American Bar Association and now in effect are hereby adopted as Canons of Ethics of the Idaho State Bar."

[2] (Opinion No. 50, Canons of Am. Bar Ass'n., '36 ed., p. 121):
"A lawyer, having accepted employment in ignorance of any fact which would indicate that his testimony might become indispensable to his client's cause, should not act as trial counsel after learning that he may be a witness as to other than formal matters. Whether, under such circumstances, he should immediately withdraw from all connection with the case must depend on whether he can do so without jeopardizing his client's interests. Professional honor and self-respect require that he retire from the case as soon as it is safe for him to do so." (Citing authorities)

[3] (Reports of Am. Bar Assn., '37—vol. 62, sec. 19, p. 1112):
"When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice, a lawyer should avoid testifying in court in behalf of his client."

sufficient to justify exclusion of material testimony given by the attorney in behalf of his client. Sebree v. Smith, 2 Idaho 359, 363, 16 P. 915; Hotaling v. Hotaling, 187 Cal. 695, 203 P. 745, 751; Holbrook v. Seagrave, 228 Mass. 26, 116 N.E. 889, 890; Cox v. Kee, 107 Neb. 587, 186 N.W. 974, 975; Paine v. People, 106 Colo. 258, 103 P. 2d 686, 689; In re Norton's Estate, 202 Iowa 374, 210 N.W. 438, 439; Bogart v. Brazee, 331 Ill. 160, 162 N.E. 877, 884; Miller v. Urban, 123 Conn. 331, 195 A. 193, 118 A.L.R. 951 and note, p. 954; Kellar v. Lindley, 203 Iowa 57, 212 N.W. 360, 361.

 It is further urged by appellant that testator made a new will in 1937, whereby he revoked the will in probate and left his property to other beneficiaries. We do not consider that contention as being properly before this court on appeal, for the reason that no allegation was contained in the contest complaint, to the effect that the will had ever been revoked or that a new will had subsequently been executed. In order to interpose such a defense to the regularly executed will, the facts must be alleged in the contest complaint. In re Wilson's Estate, 117 Cal. 262, 49 P. 172, 173; see, also, In re Black's Estate, 56 Cal. App.2d 796, 133 P.2d 673, 674; In re Eskridge's Estate, 51 Cal.App.2d 634, 125 P.2d 527, 528; Peoples v. Whitworth, 41 Idaho 225, 231, 238 P. 306; Denton v. Detweiler, 48 Idaho 369, 373, 282 P. 82. The contest was filed on the ground of undue influence within the statutory time (four months—sec. 15-223, I.C.A., as amended by 1943 S.L., chap. 18, p. 46). No suggestion of lost will was made until the matter came up in the court some nine months after the probate of the will, which was too late to raise a new issue in the case. In re Wilson's Estate, supra; Gwinn v. Melvin, 9 Idaho 202, 210, 72 P. 961, 108 Am.St.Rep. 119, 2 Ann.Cas. 770. Waiving for the time sufficiency of pleading, the record discloses a total absence of competent evidence to prove either the due execution or contents of the subsequent will, which it is claimed was lost. In the first place, our statute (sec. 15-231, I.C.A.) provides specifically that

"No will shall be proved as a lost or destroyed will unless the same is proved to have been in existence at the time of the death of the testator, or is shown to have been fraudulently destroyed in the lifetime of the testator, nor unless its provisions are clearly and distinctly proved by at least two credible witnesses."

See Hull v. Cartin, 61 Idaho 578, 587, 105 P.2d 196, and cases cited therein.

There is not a word of testimony in the record that the purported lost will was in existence "at the time of the death of the testator". On the contrary, the evidence shows that, after the execution of the purported later will, testator took possession of the instrument and no one claims to have seen it since. In the meanwhile, for

a period of more than eight years testator continued to do business with respondent, employed him both as his investment agent and attorney; and he frequently remarked to his friends and neighbors that respondent made better investments than he (testator) was able to do himself. The only testimony in the record, concerning the execution and delivery of the purported lost will was given by Clay Spicer and Charles H. Spicer, and their testimony in full is as follows:

"Q. Your name, please. A. Clay Spicer.

"Q. Where do you live. A. Marcola, Oregon.

"Q. How old are you. A. Well, I was born in 1876.

"Q. Where were you born. A. Trap Hill, North Carolina.

"Q. Did you know Z. V. Swearingen in his life time. A. I did.

"Q. Do you remember when you first knew him. A. Well, I first knew him, we were kids together; all my life, I guess.

"Q. What kin were you to Zeb. A. Some I guess; his father married my aunt.

"Q. When did Zeb come west, if you know. A. In 1883.

"Q. When did you come west. A. 1887.

"Q. Did you live in this section around here for some time after you came West. A. Yes, some time afterwards.

"Q. Did you know Zeb Swearingen when he—I mean see him or visit with him when he was here in Council. A. Yes, many times.

"Q. When did you go to Oregon, Mr. Spicer. A. I went from here on up to Alaska.

"Q. When was that. A. That was in September of '38, I think.

"Q. Then you went down to Oregon after you returned from Alaska. A. That is right.

"Q. How long did you live there;—when did you go there, I mean. A. Three years this fall.

"Q. Where were you living the spring of 1937. A. I think I had a place leased over on Wild Horse.

"Q. How far is that from here. A. About twenty—25 miles.

"Q. Did you have occasion to take Zeb to Weiser in the spring of 1937. A. I did.

"Q. Do you remember what month it was. A. It was the early part of March.

"Q. What was the occasion of your going to Weiser. A. Well, I stopped at his place here and I guess he had figured on going on the stage, or something, and he said, he wanted to know if I would take him to Weiser and I told him I would.

"Q. All right; anything said on your way to Weiser, why he wanted to go to Weiser; where he was going. A. He said he had some papers to make out and he didn't want everybody to know it.

"Q. What else was said. A. Well, after we got part of the way down there, I said, Where do you want to go Zeb? and I named two or three lawyers down there —I wasn't acquainted with them, but I mentioned Mr. Donart, and he said, No, he didn't want Donart.

"Q. All right; any other reason why he was going down. A. He said he was dissatisfied with the way Swanstrom was doing.

"Q. All right. What did you do after you got to Weiser. A. Well, I took him over to old man Harris.

"Q. Why did you take him there. A. Well, he was so well acquainted with Frank Harris so many years.

"Q. What happened then. A. Well, he made out a will, and in the meantime Zeb sat there—

"Mr. Langroise: We move that the answer be stricken as a conclusion; he doesn't state facts; the will would be the best evidence; and we move it be stricken as incompetent and hearsay.

"The Court: It may be stricken.

"Q. (By Mr. Ray) All right; did you overhear any conversation between Mr. Swearingen and Frank Harris. A. Well you know I left—he wanted to know if I would sign it, and he said who else can you get to sign it, so in the meantime while Frank was making the will out why I went over and got Charlie Spicer, and he drove over and we signed the will.

"Q. Did you see Mr. Swearingen sign it. A. Yes, sir.

"Q. Did you sign it as a witness. A. I did.

"Q. What was done with that will, if you know. A. I don't know; I don't know what Zeb done with it.

"Q. Then was the will read over in your presence; did you read the will. A. I signed the will and I read it over.

"Q. Do you remember the contents of it. A. No. I never expected to be called on it, I didn't. I did notice that there were two nieces of theirs that was to have $500.00.

"Mr. Donart: Just a minute; that is objected to upon the ground it is not the best evidence, unless they can produce the will. It is entirely outside of the issues; no allegation of the execution of any subsequent will.

"Mr. Langroise: It is not offered to prove the loss of the will and we move that it be stricken from the record.

"The Court: Read the question and answer. (Last question and answer read)

"The Court: Objection sustained; it may be stricken, the latter part of the answer.

"Q. (By Mr. Ray) Did you notice that there was any cancellation, or revocation clause in it.

"Mr. Donart: To which we object upon the ground it would be hearsay; not the best evidence; the instrument itself, if

there is an instrument, would speak for itself.

"Mr. Ray: Just a minute then. Strike that.

"Q. I think I asked you if you know, what if anything happened to the will. A. Zeb took the will.

"Q. Did you ever see it subsequently. A. No, I did not.

"Q. Did he ever tell you what he did with it. A. No.

"Q. Do you know anything about it since that occasion. A. I don't know anything about it.

"Mr. Ray: Now I repeat my question.

"Mr. Donart: We still maintain they have not laid the foundation; this man is not a party to the action; that he doesn't know what became of it is no evidence that it is not still in existence.

"The Court: Objection sustained.

"Q. (By Mr. Ray) Regardless of the contents of it, you saw Zeb sign it and you and Charlie signed it as witnesses. A. That is right.

"Mr. Ray: I think you may ask him.

"Cross-Examination (By Mr. Donart:)

"Q. Where is Charlie Spicer. A. He is here.

"Q. About what time of the year was it in 1937 that you made this trip to Weiser. A. Well, it was in the forepart of March, as I remember.

"Q. The forepart of March you went to Frank Harris' office. A. That is right.

"Q. Where was his office at that time. A. It was at his house, 502 East Main Street.

"Q. Is that where you found him. A. That is where we found him.

"Q. About what time of day was it when you went out there. A. I gather it was around three o'clock.

"Q. Three o'clock in the afternoon. A. Yes, sir.

"Q. And that was about March, 1937. A. That is right.

"Q. Do you know as a fact that Frank Harris was probate judge at that time and had his office out at the old court house, about a mile and a quarter out from the main part of Weiser. A. He had a place where he lived.

"Q. Frank Harris' office was in the court house at that time and didn't he keep the probate court open from nine o'clock in the morning until five o'clock in the evening. A. I suppose so, but he wasn't at the court house.

"Q. You went out to the house. A. He was at the house.

"Mr. Donart: That is all, sir.

"Mr. Ray: That is all.

* * * * * *

"Direct Examination.

"Q. Your name. A. Charles H. Spicer.

"Q. Where do you live. A. At Weiser, Idaho.

"Q. How long have you resided there. A. Thirty-seven years.

"Q. Did you know Z. V. Swearingen in his lifetime. A. I saw him one time before this particular day.

"Q. You had no particular acquaintance with him. A. No, I did not.

"Q. Are you any kin of his. A. No relation.

"Q. Recalling some time in the spring of 1937, in Weiser, did you have occasion to go out to Frank Harris' office with Clay Spicer. A. Yes.

"Q. Why did you go over there. A. Clay come after me in a car to sign some papers.

"Q. And you went to Mr. Harris' office. A. We went to his residence.

"Q. What did you find there. A. His will.

"Q. Did you see Mr. Swearingen sign it. A. Yes, he signed it in our presence.

"Q. Did you sign as a witness. A. Yes.

"Q. Did you hear the will read. A. Yes, I did.

"Q. Do you remember any of the provisions of the will.

"Mr. Langroise: We object to that on the ground it is incompetent; not the best evidence.

"The Court: Objection sustained.

"Q. (By Mr. Ray) Do you know what happened to the will after you witnessed it. A. Zeb had it in his possession; I supposed he took it with him.

"Q. Never seen it since then. A. No.

"Q. Never seen him since. A. No, never seen him since.

"Q. Do you remember anything that was said by Mr. Swearingen, while you were there, as to why he was making another will. A. I think he made some remark—I don't remember just what it was. One remark I believe he made about it, he didn't want people to scrap over his estate after he was gone.

"Mr. Ray: That is all.

"Mr. Donart: No cross-examination."

The will in probate when executed, September 10, 1936, was left in possession of the attorney, Mr. Donart, who drafted it, and it remained in his safe continuously from that time until the death of the testator, February 3, 1945. Furthermore, the evidence discloses that, upon the request of testator, respondent prepared and had executed, November 8, 1944, satisfaction of a $1,000 mortgage held against Everett Woods and also delivered certain pieces of personal property to different persons named by testator to whom he desired to give such articles.

After a will is regularly executed in conformity with the requirements of the statute and admitted to probate, and a contest is subsequently tendered for revocation thereof, the burden of proof is upon the contestant and continues so until overcome by a preponderance of the evidence. 3 Church's Probate Law and Practice, p. 2293; Caeman v. Van Harke, 33 Kan.

333, 6 P. 620, 624; Hill v. Kennedy, 134 Kan. 560, 7 P.2d 88, 90.

The contention of appellant, that the court erred in refusing to require respondent to produce his books of account, is entirely without merit. This was not an action in accounting. No complaint had ever been made by the testator that accounts between him and respondent were unsatisfactory. All the evidence discloses that, as between respondent and testator, the accounts had been entirely satisfactory and continued so for over eight years, as above stated, since the execution of the will in probate.

The judgment of the district court should be affirmed, and it is so ordered, with costs awarded to respondent.

GIVENS and MILLER, JJ., concur.

HOLDEN, Justice (specially concurring).

The record in this case discloses Mr. Donart testified:

"Q. (By Mr. Ray) Mr. Donart, you have been acting as attorney for Mr. Swanstrom since, I believe, the filing of the petition in the Probate Court, is that true? A. I acted as attorney for him I presume, my name is on the papers that were filed as attorney for Mr. Swanstrom as executor. If you want to know the facts, he did the work as far as probating the estate is concerned."

The record discloses he further testified:

"Q. So far as you are concerned you will be an essential witness to [for] him in the trial of this case. A. I think so in that, in one respect I am probably the only witness who could testified to that, but it is my intention to testify as a subscribing witness, and I will also say, and I have know[n] that all the time from here on Mr. Ray, I intend [to] do no participating in the trial of the law suit; for all intents and purposes, I am withdrawing as attorney when I get off the witness stand."

It appears Mr. Donart fully complied with Rule 151, as well as with Opinion No. 50, Canons American Bar Association (1936 Ed.), page 121. Hence, appellant's objection in the court below was properly overruled and his assignment of error based thereon is without merit.

I concur in affirming the judgment.